CONSUMERS POWER COMPANY v PUBLIC SERVICE
COMMISSION

Docket No. 126536. Submitted February 20, 1991, at Lansing. Decided
May 7, 1991, at 9:10 A.M. Leave to appeal sought.

In September 1987, the Midland Cogeneration Venture Limited
Partnership (MCV) filed an application with the Public Service
Commission for approval of a contract to supply to Consumers
Power Company electricity produced at the MCV's 1350 mega-
watt gas-fired qualifying cogeneration facility for a period of
thirty-five years at an average avoided capacity cost of 4.15
cents per kilowatt-hour. Following extensive hearings, the PSC
issued an interim order in January 1989 approving capacity
charges for up to 1,160 megawatts of additional capacity from
qualifying cogeneration and small power production facilities,
provided that the capacity rate not exceed 3.77 cents per
kilowatt-hour and that certain other restrictions were observed.
Following rehearing, the PSC amended its order to limit the
backloading of rates to the first 17.5 years of each power
purchase agreement. Consumers then filed various signed and
unsigned power-purchase agreements with qualifying facilities
and requested that it be permitted to purchase an additional
250 megawatts of backup capacity from the MCV project. The
PSC rejected this request, dismissed complaints that Consumers,
because of its relationship to the MCV, had not dealt fairly with
any other qualifying facility, and indicated that it would ap-
prove all the signed and unsigned contracts with qualifying
facilities except the backup capacity and principal contracts
with the MCV. Consumers maintained that the PSC's refusal to
approve the entire package required rejection of all unsigned
power-purchase agreements. The PSC further amended its in-
terim order. Consumers, the MCV, and various other qualifying
facilities and interested parties appealed.

The Court of Appeals *held:*

The PSC properly exercised its authority pursuant to MCL
460.6j; MSA 22.13(6j) in determining the avoided capacity cost
which could be passed to customers through the power supply

REFERENCES
Am Jur 2d, Public Utilities §§ 232, 242.

cost reconciliation process, in determining future capacity needs, in determining the costs that would be avoided by using a hypothetical coal-fired facility to project Consumers' cost to provide the necessary capacity, and in adopting a rate structure which would reflect the avoided costs over the term of the contract. However, the PSC exceeded its authority in limiting the portion of the avoided capacity which could be supplied by a single qualifying facility and in limiting the portion which could be produced from a single fuel source. Consumers could properly contract with the MCV to have its entire projected needed capacity supplied from the MCV gas-fired cogeneration facility, and the PSC should have approved that contract if the negotiated price was no more than the projected avoided capacity costs on the date the contract was signed. A remand to the PSC is necessary for a determination of the avoided capacity cost on the date the contract was signed.

1. The PSC, in the exercise of its statutory power to determine the capacity costs which may be passed on to a utility's customers, has authority to determine the capacity costs avoided by the purchase of power from qualifying cogeneration and small power facilities. Because a determination of the utility's future capacity needs is necessary to estimate future avoided capacity costs, the PSC has authority to determine future capacity needs as a part of the process of approval of a public utility's long-term contract to purchase power from a qualifying facility.

2. The PSC has no authority to limit the proportion of the avoided capacity which may be supplied by any one qualifying facility or to limit the proportion of the avoided capacity which may be supplied by a particular type of fuel.

3. A public utility is free to negotiate with any qualifying facilities; however, the utility is subject to the federal requirement that it pay the full avoided costs for any electricity purchased from a qualifying facility if it is unable to negotiate some other rate, and will be able to pass through to the ratepayers only those avoided capacity costs which the PSC has determined to be reasonable.

4. There was clear and satisfactory evidence supporting the choice by the PSC of the method used to project the avoided future capacity costs. The use of a hypothetical 1,350 megawatt coal-fired plant to determine the future avoided capacity costs was proper, and the determination that 1,160 megawatts of new capacity would be needed in the future was within the range of the evidence presented.

5. The avoided capacity charge adopted by the PSC was

consistent with the method and within the range of evidence presented. The fact that the PSC in a prior proceeding determined on different evidence that a different avoided capacity charge was proper does not preclude it from making a new and different avoided capacity cost projection in this proceeding using updated data.

6. The PSC has authority to backload the average avoided capacity cost rate, i.e., reduce the rate in early years and increase it in later years so that the average rate during the designated period equals the projected average avoided capacity cost rate. The PSC also has authority to adjust the degree of backloading for different types of qualifying facilities to reflect the different construction costs and projected fuel prices associated with the different types of qualifying facilities.

7. The PSC is not the appropriate forum to determine whether the dealings between the MCV and the Consumers Power Company constitute a violation of antitrust laws.

8. The PSC should deny approval of Consumers' contract with the MCV only if the negotiated rate of 4.15 cents per kilowatthour exceeded the avoided capacity costs on the date the agreement was signed. Because it is unclear whether the avoided capacity cost rate determined by the PSC was the rate on that date, a remand to the PSC is necessary.

Remanded.

1. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — AVOIDED COSTS — QUALIFYING FACILITIES.

The Public Service Commission in its consideration of a request for approval of a contract for the purchase of electricity by a public utility from a qualifying cogeneration or small power facility must determine whether the negotiated rate of payment by the public utility for its avoided capacity costs is reasonable, i.e., whether the negotiated rate does not exceed the actual avoided capacity costs; the commission, in the exercise of that authority, has the authority to find the utility's future capacity needs, to find the projected costs of the facilities that would be needed to meet that future capacity need, and to set a rate structure that would insure that rates reflect the actual avoided costs throughout the designated contract period; the commission does not have the authority to designate the particular qualifying facility the utility will use to satisfy its capacity needs, to limit the amount of the needed capacity that may be satisfied by a single qualifying facility, or to limit the amount of needed capacity that could be supplied by one type of fuel (MCL 460.6j[13][b]; MSA 22.13[6j][13][b]).

2. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — AVOIDED COSTS — RATE DETERMINATIONS.

   The Public Service Commission, in determining whether an avoided capacity cost rate in a long-term contract for the purchase of electricity by a public utility from a qualifying cogeneration or small power facility is reasonable, is not bound by its determination in a prior proceeding of projected future avoided capacity costs where there is new evidence relative to projected avoided capacity costs.

3. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — AVOIDED COSTS — BACKLOADING OF RATES.

   The Public Service Commission may backload an average avoided capacity cost rate to provide an incentive to a qualifying cogeneration or small power facility to complete a long-term agreement with a public utility for the sale of electricity and to balance the construction costs and projected fuel prices of different types of qualifying facilities.

4. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — MONOPOLIES.

   The Public Service Commission is not the appropriate forum in which to raise the question whether a contract for the purchase of electric power by a public utility from a qualifying cogeneration facility is violative of antitrust laws because of a vertical or horizontal ownership relationship between the public utility and the qualifying facility.

*Steven H. Lasher,* and *Riecker, George, Van Dam & Camp, P.C.* (by *Philip Van Dam*), and *Foster, Swift, Collins & Smith, P.C.* (by *William K. Fahey, Steven O. Schultz,* and *Glen A. Schmiege*), for the Midland Cogeneration Venture Limited Partnership.

*David A. Mikelonis* and *Denise M. Sturdy,* and *Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *William D. Parsley, Harvey J. Messing* and *Richard J. Aaron*), for the Consumers Power Company.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Luis F. Fernandez* and *Sevahn A. Merametdjian,* Assistant Attorneys General, for the Attorney General.

*Conner & Bentley, P.C.* (by *Pat D. Conner*), for James River Corporation of Virginia and James River Paper Company.

*Bertie Nelson Butts, III,* and *Conner & Bentley, P.C.* (by *Pat D. Conner*), for the Dow Chemical Company.

*Varnum, Riddering, Schmidt & Howlett* (by *Bruce Goodman*), for Energy Michigan.

*Hill Lewis* (by *Robert A. W. Strong* and *Charles G. Goedert*), for the Association of Businesses Advocating Tariff Equity.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *David E. S. Marvin*), for Grand River Equities, Inc., Indeck Energy Services of Otsego, Inc., and Indeck Energy Services of Baldwin, Inc.

*Thomas J. Emery* and *James E. Riley,* Assistant Attorneys General, for the Department of Natural Resources.

*Don L. Keskey, Henry J. Boynton,* and *Philip J. Rosewarne,* Assistant Attorneys General, for the Public Service Commission.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Kester K. So*), for Cogentrix of Michigan, Inc., and Cogentrix Michigan Leasing Corporation.

*Robert C. Evans,* for Jackson Energy (Rosebud) and others.

Before: Sawyer, P.J., and Hood and Murphy, JJ.

Per Curiam. Consumers Power Company, the Midland Cogeneration Venture Limited Partner-

ship (MCV), the Attorney General, the Association of Businesses Advocating Tariff Equity (ABATE), James River Corporation of Virginia and James River Paper Company, Cogentrix of Michigan, Inc., and Cogentrix Michigan Leasing Corporation, Energy Michigan, Inc., and other parties appeal as of right a series of orders of the Public Service Commission, which decided a number of issues involving Consumers' obligation to purchase both energy and generating capacity from qualifying facilities pursuant to the Federal Public Utility Regulatory Policies Act of 1978 (PURPA), PL 95-617, 92 Stat 3117.

I

Congress enacted the PURPA as part of a package of five pieces of legislation, known collectively as the National Energy Act, designed to combat the nationwide energy crisis resulting from the quadrupling of oil prices in the early 1970s and the severe shortage of natural gas in 1977. Section 210 of the PURPA, 16 USC 824a-3, was designed to ameliorate the energy crisis by encouraging the development of alternative power sources in the form of cogeneration and small power production facilities. Subsections 17-22 of § 201 of the PURPA, 16 USC 796(17)-(22), defines a "cogeneration facility" as one that produces both electric energy and some other form of useful energy, such as steam or heat. The same section defines "small power production facility" as one that has a production capacity of no more than eighty megawatts (MW) and uses as a primary energy source biomass, waste, geothermal resources, or renewable resources such as wind, water, or solar energy.

Section 210(a) directs the Federal Energy Regulatory Commission (FERC) to promulgate rules to

encourage the development of the alternative sources of power, including rules requiring utilities to offer to buy electricity from, and to sell electricity to, qualifying cogeneration and small power production facilities (QFS). Section 210(b) directs the FERC to set rates for utility purchases of power from QFS that are (1) just and reasonable to the electricity consumers of the utility and in the public interest, (2) not discriminatory against QFS, and (3) not to exceed the incremental cost to the utility of alternative electric energy. Similarly, § 210(c) requires that rates for utility sales to QFS are to be just and reasonable, in the public interest, and not discriminatory against QFS. Section 210(e) directs the FERC to adopt rules exempting certain QFS from most state and federal public utility regulation. Finally, § 210(f) requires each state regulatory authority (such as the PSC) and nonregulated utility to implement the FERC's rules.

In 1980, the FERC adopted regulations implementing the PURPA, codified at 18 CFR 292.101-292.602, requiring utilities to purchase power from QFS at the full "avoided cost." 18 CFR 292.303(a) provides:

> Each electric utility shall purchase, in accordance with § 292.304, any energy and capacity which is made available from a qualifying facility.

18 CFR 292.304 provides in part:

> (a) *Rates for purchases.* (1) Rates for purchases shall:
> (i) Be just and reasonable to the electric consumer of the electric utility and in the public interest; and
> (ii) not discriminate against qualifying cogeneration and small power production facilities.
> (2) Nothing in this subpart requires any electric

utility to pay more than the avoided costs for the purchases.

* * *

(b). *Relationship to avoided costs.* . . .

(2) Subject to paragraph (b)(3) of this section, a rate for purchases satisfies the requirements of paragraph (a) of this section if the rate equals the avoided costs determined after consideration of the factors set forth in paragraph (e) of this section.

18 CFR 292.101(b)(6) defines avoided costs as follows:

"Avoided costs" means the incremental cost to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source.

Under the regulations, avoided cost comes in two varieties: avoided energy and avoided capacity cost. The distinction between these types of avoided cost was explained in the summary of the final regulations found at 45 Fed Reg 12,216, (February 25, 1980), as follows:

The costs which an electric utility can avoid by making such purchases generally can be classified as "energy" costs or "capacity" costs. Energy costs are the variable costs associated with the production of electric energy (kilowatt-hours). They represent the cost of fuel, and some operating and maintenance expenses. Capacity costs are the costs associated with providing the capability to deliver energy; they consist primarily of the capital costs of facilities.

If, by purchasing electric energy from a qualify-

ing facility, a utility can reduce its energy costs or can avoid purchasing energy from another utility, the rate for a purchase from a qualifying facility is to be based on those energy costs which the utility can thereby avoid. If a qualifying facility offers energy of sufficient reliability and with sufficient legally enforceable guarantees of deliverability to permit the purchasing electric utility to avoid the need to construct a generating unit, to build a smaller, less expensive plant, or to reduce firm power purchases from another utility, then the rates for such a purchase will be based on the avoided capacity and energy costs.

While 18 CFR 292.303(a) requires an electric utility to purchase energy and capacity made available from a QF, 18 CFR 292.304(a)(2) limits the payment for such purchases to the avoided costs. Therefore, if a utility has no need for capacity, then even though it may pay an avoided energy cost to a QF, its avoided capacity cost will be zero, and it will not be required to make any capacity cost payments to the QF.

Finally, to implement § 210(f) of the PURPA, which requires each state regulatory authority and nonregulated utility to implement the FERC's rules, the FERC adopted 18 CFR 292.401, which provides in part:

> (a) *State regulatory authorities.* Not later than one year after these rules take effect, each State regulatory authority shall, after notice and an opportunity for public hearing, commence implementation of Subpart C (other than § 292.302 thereof). Such implementation may consist of the issuance of regulations, an undertaking to resolve disputes between qualifying facilities and electric utilities arising under Subpart C, or any other

action reasonably designed to implement such sub-part (other than § 292.302 thereof).[1]

On March 17, 1981, the PSC initiated Case No. U-6798 to implement the PURPA and the FERC rules. The PSC required each electric utility to remove any existing prohibitions on selling standby energy to or purchasing energy from QFS. The PSC further required each electric utility to file interim rates for purchasing electric power from QFS. The order set up a framework to study the addition of QF capacity to the state's utility network.

On August 27, 1982, the PSC issued a twenty-two-page final order in U-6798, making a number of findings and conclusions and, in relevant part, approving a settlement agreement covering trans-actions between Consumers and qualifying facili-ties having a design capacity of one hundred kilo-watts (kw) or less. The settlement agreement sets forth a method for computing avoided costs and requires Consumers Power to file periodic avoided cost rates along with a description of the calcula-tion method. With respect to larger QFS, the settle-ment agreement provides:

> Transactions entered into between the company and qualifying facilities having a design capacity of over 100 kw shall be subject to negotiation between the company and the qualifying facility with such negotiation to be governed by the same principles set forth in this settlement agreement. The factors to be considered in such negotiations include the factors listed at 18 CFR § 292.304(e) in addition to all other relevant factors. Rates for sales to qualifying facilities shall be governed by the applicable filed rate schedule. (See § VII).

---

[1] Section 292.302 imposes reporting duties on utilities. In particular, subsection b requires utilities to make public their plans for additions to or retirement of capacity, and to estimate capacity costs of addi-tions.

Qualifying facilities having a design capacity of more than 100 kw may choose to forego separate negotiations and may elect to accept all of the provisions of this Settlement Agreement. In such event, no variance from the terms of this settlement agreement shall be permitted.

The settlement agreement also provides:

The parties understand that the rates, rules and regulations of the company are subject to review and revision in various proceedings before the commission and that the approval of the settlement agreement cannot bind the commission in future proceedings. Thus, the parties recognize that the terms of this agreement are also subject to review and revision in future proceedings. Nothing in this settlement agreement precludes the parties from participating in such reviews or from proposing such revisions.

As required by the U-6798 order and settlement agreement, Consumers submitted avoided cost calculations to the PSC. On October 29, 1982, Consumers submitted an avoided cost calculation of 2.84 cents per kilowatt-hour (cents/kWh). On December 29, 1983, and November 1, 1984, Consumers submitted avoided cost calculations of 3.76 cents and 3.97 cents/kWh, respectively. However, in its June 12 and December 18, 1985, filings, Consumers calculated an avoided cost rate of 1.77 cents/kWh. According to the PSC, this resulted from a change in Consumers' cost calculation method.

On July 17, 1986, Consumers submitted an even lower avoided cost calculation, .98 cents/kWh, due to Consumers' switch from a coal-fired proxy to a gas-fired proxy. Consumers justified the use of a new proxy by reference to its proposal to convert its failed Midland Nuclear Generating Plant to a gas-fired facility. Four weeks later, on August 15,

1986, Consumers submitted a revised avoided cost filing that reduced the capacity rate to zero.

On August 13, 1986, the PSC staff petitioned the PSC, in Case No. U-8531, to reject Consumers' avoided cost data and order the filing of modified avoided cost rates. In September 1986, the staff presented a policy paper regarding the adoption of a proposal to encourage the future development of cogeneration and small power production in Michigan. In an October 22, 1986, interim order in U-8531, the PSC withheld final action on Consumers' July 17 and August 15, 1986, avoided cost filings until the staff's proposal could be fully reviewed.

In 1986, Tondu Energy Systems, Inc., requested approval of its power supply contract with Consumers in Case No. U-8562. Pursuant to 1982 PA 304, MCL 600.6j; MSA 22.13(6j), the PSC is required not less than once a year to conduct a "power supply cost reconciliation" proceeding to compare revenues received by a utility with the allowance for cost of power supply included in the utility's base rates. In particular, subsection 13 provided in part:

> In its order in a power supply cost reconciliation, the commission shall:
>
> * * *
>
> (b) Disallow any capacity charges associated with power purchased for periods in excess of 6 months unless the utility has obtained the prior approval of the commission.

Because utilities, and in particular Consumers, included "regulatory out" language in their contracts with QFS, which would allow the utilities to get out from under the contracts in the event relevant portions were not approved by the PSC, QFS such as Tondu could not obtain financing

without assurances that their contracts were binding.

On February 19, 1987, the PSC denied Tondu's petition, finding the avoided capacity charge requested to be unreasonable. The PSC determined, however, that the purchase of capacity at an average rate of not more than 3.99 cents/kWh would be reasonable and prudent, and invited Tondu to file such a contract, which it did. The *Tondu* decision was affirmed in *Ass'n of Businesses Advocating Tariff Equity v Public Service Comm*, 173 Mich App 647; 434 NW2d 648 (1988).

On June 27, 1987, the Michigan Legislature enacted 1987 PA 81, which amended § 6j of 1982 PA 304, MCL 460.6j; MSA 22.13(6j), to provide in part:

> (13) In its order in a power supply cost reconciliation, the commission shall:
>
> * * *
>
> (b) Disallow any capacity charges associated with power purchased for periods in excess of 6 months unless the utility has obtained the prior approval of the commission. If the commission has approved capacity charges in a contract with a qualifying facility, as defined by [PURPA], the commission shall not disallow the capacity charges for the facility in the power supply reconciliation unless the commission has ordered revised capacity charges upon reconsideration pursuant to this subsection. . . . The scope and manner of the review of capacity charges for a qualifying facility shall be determined by the commission. Except as to approvals for qualifying facilities granted by the commission prior to June 1, 1987, proceedings before the commission seeking such approvals shall be conducted as a contested case pursuant to Chapter 4 of the [APA]. The commission, upon its own motion or upon application of any person, may reconsider its approval of capacity charges in

a contested case hearing after passage of a period necessary for financing the qualifying facility, provided that:

(i) The commission has first issued an order making a finding based on evidence presented in the contested case that there has been a substantial change in circumstances since the commission's initial approval; and

(ii) Such a commission finding shall be set forth in a commission order subject to immediate judicial review. The financing period for a qualifying facility during which previously approved capacity charges shall not be subject to commission reconsideration shall be 17.5 years, beginning with the date of commercial operation, for all qualifying facilities, except that the minimum financing period before reconsideration of the previously approved capacity charges shall be for the duration of the financing for a qualifying facility which produces electric energy by the use of biomass, waste, wood, hydroelectric, wind, and other renewable resources, or any combination of renewable resources, as the primary energy source.

Following the effective date of 1987 PA 81, the Midland Cogeneration Venture on September 10, 1987, filed an application for approval of capacity charges in a contract for the sale of electricity to Consumers. In an order and notice of hearing dated September 29, 1987, in Case No. U-8871, the PSC stated that the MCV's application contained the following information:

Mcv intends to construct and operate a gas-fired cogeneration plant (the facility) in Midland, Michigan with a design capacity of approximately 1,350 mw, to supply steam and electricity to Dow Chemical Company and to sell electricity to Consumers. The proposed year of commercial operation is 1990. The agreement has a term of 35 years and the proposed average capacity rate is 4.15 cents per kilowatt-hour (kwh).

As a legal entity, the MCV is a limited partnership. Before March 12, 1990, Consumers was one of the general partners, and Consumers and its subsidiaries owned forty-nine percent of the MCV. Other partners in the venture include Dow Chemical and certain fuel suppliers to Consumers. After March 12, 1990, the forty-nine percent ownership of the MCV previously held by Consumers and its subsidiaries was transferred to Consumers' parent company, CMS Energy Corporation.

The PSC's September 29, 1987, order established formal contested case hearings to review the MCV application and to establish the avoided cost rates. Subsequently, the PSC received numerous applications, interventions, and complaints from QFs desiring to sell power to Consumers. On January 14, 1988, the PSC consolidated the MCV case, U-8871, with other cases involving QF applications and complaints involving Consumers and terminated earlier dockets commenced to develop the regulatory framework for cogeneration and small power production, including U-8531.

According to the PSC, thirty of the eighty-five projects in the consolidated case involved complaints filed by QFs against Consumers. The commonly recited grievance was Consumers' refusal to negotiate or its refusal to execute a power purchase agreement with the QF. Other parties intervening represented a variety of interests, ranging from government agencies, industrial user organizations, and public interest groups to a variety of cogeneration interests and qualified cogeneration or small power production projects.

Hearings were held beginning on May 2, 1988, and continued through August 30, 1988, with a rebuttal phase from September 6 through September 30, 1988. Approximately sixty parties participated, representing QF projects with a combined

capacity exceeding 3,000 MW. More than one hundred witnesses testified, creating more than 14,000 pages of transcript and more than four hundred exhibits.

On January 31, 1989, the PSC issued its first substantive interim order. The PSC approved capacity charges for up to 1,160 MW of additional capacity from cogeneration and small power production facilities, provided that the capacity rates would not exceed 3.77 cents/kWh, the capacity rates would be backloaded[2] by ten percent for projects fueled by coal or peat and by twenty-five percent for projects fueled by natural gas or oil, any one project would not supply more than fifty-five percent of the capacity, and no more than seventy-five percent of the capacity would be supplied by a single type of fuel. The PSC held that these determinations were inextricably intertwined and that the balance of important competing policy choices would be destroyed if the relationship among the capacity rate, capacity limit, and allocation requirements were altered. The order allowed Consumers ninety days to negotiate and sign contracts with QFs from which it would purchase capacity subject to the conditions of the order. The PSC stated that, because of Consumers' greater technical and business expertise, the PSC would leave to Consumers the choice of QFs with which to contract, subject to the limitations already noted.

Various parties filed requests for clarification, rehearing, or both, and on March 30, 1989, the PSC issued an order granting Consumers' request that backloading be limited to the first 17.5 years of each affected power purchase agreement rather

---

[2] "Backloading" means that, while the average price paid over the length of the contract is 3.77 cents, payments made to the QF are reduced by the backloading amount at the beginning of the project and increased by that amount at the end of the contract.

than the life of the contract. The PSC refused to authorize Consumers to contract with the MCV for backup capacity in the event such capacity was required in the future, finding that such eventuality should be dealt with when and if it arises. Finally, the PSC rejected ABATE's arguments for the use of a gas-fired proxy in calculating avoided capacity costs, holding that the use of a coal plant proxy was consistent with prior determinations, such as U-6798, and in any event provided a simpler and probably more accurate forecast of avoided capacity costs.

On May 2, 1989, Consumers submitted ancillary filings, as required by the PSC's January 31, 1989, interim order, consisting of a package of power purchase agreements, both signed and unsigned, for approximately 1,143 MW of capacity. The package also included two unsigned power purchase agreements for 116 MW of backup capacity, and a request to purchase an additional 250 MW of capacity from the MCV project. Consumers indicated that it would sign the unsigned contracts with the other QFs if the commission would approve the additional 250 MW of capacity for the MCV.

On June 22, 1989, the PSC issued an order rejecting Consumers' request for the 250 MW of backup capacity from the MCV, noting that the 1,160 MW of approved future capacity was well within the forecast limits presented on the record (Consumers forecast 1,900 MW, while the PSC staff forecast 680 MW). The PSC reiterated its position that subsequent proceedings would be the appropriate vehicle for determining future needs beyond 1997 when and if such future needs became apparent. The PSC also addressed numerous complaints raised by QFs with whom Consumers had not submitted either a signed or unsigned contract. These QFs claimed that Consumers was dealing

unfairly with them, and that their projects merited greater attention and concern. Although the psc found that Consumers' dealings with the mcv were not at arms length, and that Consumers went to great lengths to be sure that it could buy as much capacity from the mcv as possible, it nevertheless continued to hold that Consumers should have primary responsibility for selecting qfs to receive capacity allocations. Therefore, the psc concluded that if the signed and unsigned contracts were executed and submitted pursuant to the order, they would be approved. In essence, the psc held that it would approve all of the contracts except the 250 mw of backup capacity from the mcv and the principal contract with the mcv, which continued to call for a capacity charge of 4.15 cents/kWh.

On June 27, 1989, Consumers sent letters to the commission and numerous qfs terminating Consumers' commitments to project developers without signed contracts. Consumers stated that the psc's refusal to approve the entire package as submitted required it to reject all unexecuted power purchase agreements.

Following various requests for rehearing or clarification, on September 26, 1989, the commission directed the parties to brief specific issues in light of Consumers' contract terminations. On December 21, 1989, the psc addressed the rehearing petitions. The psc revised the backloading of capacity payments for projects fueled by natural gas and oil to forty percent, from a previous twenty-five percent. The psc found that the limitation on fuel type (no more than seventy-five percent of capacity allocated to any one type of fuel) was still necessary, but it was not necessary to maintain a fifty-five percent capacity limit for any individual plant, finding this latter requirement redundant or un-

necessary given the former requirement. Thus, within the overall fuel limit, any number of facilities could provide the capacity. In effect, this allowed Consumers to increase the capacity eligibility of the MCV gas-fired project to seventy-five percent of total approved additional capacity, or 870 MW of the 1,160 MW that had been approved. Finally, the PSC approved the capacity rates and amounts applicable to projects other than those fueled by natural gas for purposes of the PURPA, 1987 PA 81, and 1982 PA 304.

On January 22, 1990, Consumers filed a motion seeking ancillary relief, requesting that the PSC change the backloading period again, this time from 17.5 years to 10 years, claiming that this would prevent an accounting mismatch and a potential write-off on its books. Consumers also requested that the PSC approve capacity rate for up to 870 MW for QFS using natural gas as a fuel. The PSC treated Consumers' motion as one for rehearing and on February 22, 1990, denied it. The PSC noted that the accounting mismatch and write-off did not result from any PSC action, but from Consumers' own contract with the MCV and its refusal to renegotiate. The PSC approved 29.4 MW of capacity for Ada Cogeneration, which uses natural gas, and noted that a total of 840.6 MW of natural gas-fired capacity remains available for projects or contracts that comply with the PSC's orders.

II

A

On appeal, Consumers[3] argues that the PSC exceeded its authority under both state and federal

---

[3] Our identification of arguments by the names of one or at most two representative parties is not intended to slight the similar argu-

law. Consumers argues that Congress intended that the PURPA be administered with a minimal intrusion on freedom of contract. Consumers admits that 18 CFR 292.303(a) requires electric utilities to purchase energy and capacity made available from QFs, and that 18 CFR 292.304(a)(2) and 292.304(b)(2) together set full avoided costs as the appropriate payment rate. However, Consumers argues that these provisions must be read in conjunction with 18 CFR 292.501, which provides:

> (a) *Applicability.* This subpart applies to the regulation of sales and purchases between qualifying facilities and electric utilities.
> (b) *Negotiated rates or terms.* Nothing in this subpart:
> (1) Limits the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions which would otherwise be required by this subpart; or
> (2) Affects the validity of any contract entered into between a qualifying facility and electric utility for any purchase.

Consumers argues that this regulation recognizes the basic right of utility management and qualifying facilities by contract to set the price, terms, and conditions of the power supply being procured by the utility, free of federal or state regulatory interference.

Consumers argues that the provisions of 1982 PA 304 and 1987 PA 81 do not allow the PSC to intrude as much as it has in contracts between Consumers and QFs, or in the alternative that those provisions are preempted by federal law.

ments advanced by other parties, but only to avoid confusion and simplify the presentation of the issues.

Recognizing that § 210(f) of the PURPA and 18 CFR 292.401(a) require the involvement of state regulatory authorities in the implementation of the PURPA and the FERC's rules promulgated thereunder, Consumers argues that the proper role of the PSC in implementing the PURPA is to adopt regulations or set out an equivalent framework, as it did in its *Tondu* decision, to allow a utility to calculate its estimated avoided costs and select the QFS with which it wishes to deal. All other actions by the PSC in this case, and in particular the PSC's attempt to limit the total amount of estimated future capacity which can be filled by any single fuel type and to dictate to Consumers the QFS with which it must deal, are unlawful because they are beyond the jurisdiction of the PSC.

The MCV agrees with Consumers and, in addition, notes that 18 CFR 292.304 provides in part as follows:

(d) *Purchases "as available" or pursuant to a legally enforceable obligation.* Each qualifying facility shall have the option either:

(1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or

(2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:

(i) The avoided costs calculated at the time of delivery; or

(ii) The avoided costs calculated at the time the obligation is incurred.

The MCV argues that it is entitled as a matter of federal law to elect contract rates based upon an estimate of avoided costs calculated at the time the contract is entered into. The MCV claims that the contract entered into with Consumers in 1987, calling for a capacity rate of 4.15 cents/kWh, is .01 cents less than the amount approved in the *Tondu* decision when an inflation factor is taken into account. Therefore, the MCV argues that it is entitled to the higher contract rate and not the 3.77 cents/kWh approved by the PSC.

Consumers and the MCV agree that the holding in *Union Carbide Corp v Public Service Comm,* 431 Mich 135; 428 NW2d 322 (1988), applies to this case. In *Union Carbide,* the Supreme Court determined that the PSC acted properly in preventing Consumers from passing on to ratepayers any additional fuel expenses incurred while operating oil-fired generating units, but that the PSC exceeded its authority to regulate a utility's rates and charges when it ordered Consumers to cease operating the oil-fired units. *Id.* at 149-150. The Court held that the PSC is strictly a creature of statute and that the PSC could point to no statute giving it the authority it claimed to possess in that case. Similarly, Consumers and the MCV argue that the PSC here improperly exceeded its jurisdiction to regulate rates, charges, and conditions of service when it, in effect, attempted to make managerial decisions on behalf of Consumers and QFS.

The PSC responds that the legislative history and text of § 210(f) of the PURPA make clear that the Congress intended that state regulatory agencies would be the mechanism by which the PURPA regulations were implemented and enforced in the various states. The PSC notes that Rule 401(a) requires the PSC to implement the PURPA regulations, but leaves to the PSC the decision regarding

the manner of implementation. Therefore, the PSC argues that it is not limited to setting up a regulatory framework or a method pursuant to settlement as in Case No. U-6798, but rather can implement the PURPA regulations in the manner it sees fit as best meets the needs of this state.

The PSC argues that the MCV mistakenly relies on Rule 304(d) in support of its position that the PSC is bound by the rate approved in the *Tondu* decision. Although the MCV indeed may be entitled to an avoided cost rate determined as of the date on which the obligation was entered into, this does not mean that the MCV is entitled to an avoided cost based on the best estimate determined on or before the date the obligation is incurred.

The PSC also argues that Consumers and the MCV are mistaken in arguing that they are entitled to an avoided cost rate calculated as in the *Tondu* case, using the U-6798 method, appropriately adjusted for different dates of service. The PSC notes that the *Tondu* case involved a rather small cogenerator and the record created in that case was therefore nowhere near as extensive as that involved in this case. In addition, this case was the first one held under the requirement of 1987 PA 81 that the PSC use contested case proceedings to establish capacity cost rates applicable to QFS. The PSC also notes that the U-6798 method is contained in the settlement agreement approved by the PSC, which by its terms states that it is not binding in future cases coming before the PSC. Finally, the PSC argues that, as a matter of logic, the rate established in the *Tondu* case cannot be considered set in stone, inasmuch as avoided cost rates may change over time because of changes in the amount of capacity a utility is determined to need.

The PSC claims that the *Union Carbide* decision

is not directly applicable here, because the PSC is acting pursuant to a federal grant of power and therefore is not limited to its enumerated statutory powers in Michigan. Moreover, the PSC argues that the *Union Carbide* decision is a very narrow one, inasmuch as the Supreme Court considered a number of claimed bases for the PSC's authority to order Consumers to take action in that case, but rejected them because all those statutory grants of authority were conditional upon the filing of a written complaint with the PSC. The Supreme Court held all of those statutory provisions to be inapplicable in *Union Carbide* because no written complaint was at issue there. Inasmuch as this case involves not only the MCV's original application, but also numerous solicited complaints as well as consolidated cases involving complaints by QFS, the PSC argues that the holding in *Union Carbide* is not directly applicable.

Although James River largely agrees with the PSC, it argues that the PSC's attempt to implement the PURPA in this case was only half-hearted. James River claims that the PSC not only should determine avoided capacity costs, total future capacity, and allocation based on fuel sources, but also, should carry out the actual allocation of capacity among QFS, i.e., the PSC should determine which of the QFS Consumers should contract with. James River complains that much of the record in this case was a meaningless exercise, inasmuch as it consists of evidence by various QFS regarding the superiority of their facilities over the MCV or other facilities and, hence, the appropriateness of selecting their facilities as a capacity source for Consumers. James River complains that the PSC unaccountably ignored the record and unlawfully delegated to Consumers the duty of determining which QFS would supply future capacity, allegedly be-

cause of Consumers' greater technical and business expertise.

In support of its position, James River relies on the so-called *Ashbacker* doctrine. At issue in *Ashbacker Radio Corp v Federal Communications Comm,* 326 US 327; 66 S Ct 148; 90 L Ed 108 (1945), was the FCC's consideration of two applications for a radio license. The FCC granted a license to one applicant without a hearing and on the same day set the other application for hearing. Because each applicant had a right under the statute to a hearing before its application was finally denied, the United States Supreme Court held that if the grant of one application effectively precluded the grant of the other, the statutory right to a hearing which Congress had accorded applicants before denial was "an empty thing." The Court held that "where two *bona fide* applications were mutually exclusive the grant of one without a hearing to both deprives the loser of the opportunity which Congress chose to give him." *Id.* at 333. This Court applied the *Ashbacker* doctrine to parties making mutually exclusive applications for certificates of need under the Public Health Code in order to build hospitals. *Huron Valley Hosp, Inc v State Health Facilities Comm,* 110 Mich App 236, 246-248; 312 NW2d 422 (1981).

James River argues that, even though this is not a case where approving one contract will mean the disapproval of all others, it is clear that some QFS will win and others will lose in the attempt to supply capacity to Consumers. Therefore, comparative hearings were necessary under the *Ashbacker* doctrine. James River argues that although the parties were given an opportunity to create a record, the PSC ignored a large and relevant portion of that record when it determined that Consumers should decide which QFS would supply

capacity subject to other restrictions imposed by the PSC.

## B

We begin our analysis by noting that the PSC possesses no "common law" powers. It is a creature of the Legislature, and all of its authority must be found in statutory enactments. Generally, a statute which grants power to an administrative agency is to be strictly construed. Administrative authority must be affirmatively or plainly granted, for doubtful power does not exist. *Miller Bros v Public Service Comm,* 180 Mich App 227, 232; 446 NW2d 640 (1989).

The PSC initiated case U-6798 to implement the PURPA in Michigan. The proceedings in that case terminated with an order incorporating a series of settlement agreements, one of which involved Consumers Power. That settlement agreement included, among other things, a method for determining avoided costs and required Consumers to periodically file with the PSC its calculated avoided cost rate.

Because of concerns raised by the PSC staff regarding Consumers' avoided cost filings, and because of the MCV's application for PSC approval of a contract to supply a very large amount of cogeneration capacity to Consumers, the PSC determined to revisit questions tentatively settled in the U-6798 case with respect to the implementation of the PURPA. This appears to be reasonable and permissible under the PURPA and the FERC's regulations, which allow the use of case-by-case reviews. The PSC also ordered that other pending cases involving the implementation of the mandate of the PURPA by Consumers be consolidated with the MCV's application for approval in Case

No. U-8871 in order to afford the PSC the largest possible range of viewpoints on questions presented. This, too, appears to be a reasonable exercise of the PSC's obligations under the PURPA. Finally, however, the PSC also determined that as part of its wide-ranging review it would determine, not only Consumers' future capacity needs and avoided capacity cost, but also would allocate (whether directly or indirectly) such capacity among QFs. The PSC exceeded its authority in so doing.

The PURPA requires utilities to purchase needed energy and capacity offered by QFs at full avoided cost, subject, however, to the right of the parties to negotiate a price of their own choosing. In other words, if a utility and a QF fail to reach agreement on a contract price, the QF may nevertheless insist that the utility purchase needed energy and capacity at full avoided cost. Because a utility is required by Rule 302 to file cost data and projections with the state regulatory agency, the QF knows the rate which it would receive if negotiations fail.

Although nothing in the PURPA or the FERC's regulations explicitly states that state regulatory authorities may set the avoided cost rate, this is arguably a necessary and proper power implied by the statutory and regulatory scheme, without which QFs would be at the mercy of utilities' estimations of their future capacity needs and the costs of satisfying those needs. Even if the PSC does not possess authority under federal law to determine avoided costs, the PSC has authority under state law to determine whether costs incurred by public utilities like Consumers are reasonable and may therefore be passed on to ratepayers. If a utility and a QF negotiate an agreement whereby the utility pays a capacity charge to the QF, and if in fact that cost is at or below the utility's actual

avoided cost, then it is reasonable and may be passed through to ratepayers. Pursuant to MCL 460.6j(13)(b); MSA 22.13(6j)(13)(b), the PSC is required to disallow pass-through of capacity charges associated with power purchased for periods in excess of six months unless the utility has obtained the prior approval of the PSC. Therefore, if a utility wishes to pass through the capacity payments it makes to a QF, and if the QF wishes to know whether its contract with the utility is binding even though it contains a "regulatory out" clause, then the utility or the QF will submit the contract to the PSC for review. Nevertheless, under the federal regulatory scheme the parties may, if they wish, agree to a higher rate of capacity charge, so long as they realize that those costs will not be passed through to ratepayers.[4]

In the instant case, Consumers and the MCV negotiated an agreement calling for capacity cost payments from Consumers to the MCV of 4.15 cents/kWh. The MCV initiated case U-8871 by submitting the contract to the PSC for approval under § 6j(13)(b). The PSC's determination of Consumers' avoided capacity cost for purposes of § 6j(13)(b) was appropriate and lawful. The PSC's determination of Consumers' future capacity needs was likewise proper and lawful. Such a finding is necessary for the purpose of determining avoided capacity costs, if only because the future need for capacity will determine the total amount of capacity charges which can be approved under § 6j(13)(b). Any capacity cost payments made by a utility to a QF which exceeds needed capacity should be

[4] Our analysis of the relationship between federal and state regulatory law is supported by the decision in *Barasch v Pennsylvania Public Utility Comm,* 119 Pa Commw 116; 546 A2d 1296 (1988), and by the summary of the FERC's final regulations in 45 Fed Reg 12,217 (February 25, 1980).

disallowed as unreasonable, because the actual avoided cost is zero.

There is no state or federal authority, however, for the PSC's attempt in its interim order to limit the size of any one QF dealing with Consumers or its final decision to limit the total capacity which may be supplied by any one type of fuel. Congress could have limited the absolute size of a qualifying cogenerating facility. It did not. Congress could have required that capacity from QFS be accepted in some manner which would allocate among fuel sources the capacity supplied. It did not. Although the PSC's stated goal of encouraging a diversity of QFS with a variety of fuel types is laudable, as is its concern that the MCV facility is so large as to crowd out other potential applicants,[5] it is not for the PSC to determine questions of public policy. As noted above, the PSC is entirely a creature of statute and must find its powers and purposes under those statutes. In this case, the PSC is operating under both state and federal statutory and regulatory authority. That authority does not grant the PSC the sweeping powers it claims to possess in this case.

We are not persuaded that the PSC possesses the powers it claims to have under state law simply because some parties filed complaints. Although the PSC argues that *Union Carbide* is distinguishable, the PSC has not demonstrated that its statutory authority to adjudicate complaints includes the powers it claims here. Moreover, although

[5] In its preamble to the PURPA regulations, the FERC observed that, because cogenerators used significantly less energy to produce electricity and, e.g., steam than would be necessary to produce them separately, "cogeneration facilities can make a significant contribution to the Nation's effort to conserve its energy resources." 45 Fed Reg 12,215 (February 25, 1980). Therefore, while the size of the MCV facility may limit the opportunities for small power producers, the fact that it is a cogenerator may contribute significantly to the congressional intent underlying the PURPA.

dicta, the Supreme Court suggested that none of the statutes governing complaints granted the PSC authority to make managerial decisions for utilities. *Id.* at 154-155, 159, 161-162.

To the extent that the PSC actually ordered Consumers to enter, or not enter, into any particular contract, it exceeded its authority. Contrary to Consumers' and the MCV's allegations, however, the PSC did not explicitly order Consumers to enter into any particular contract or to abrogate any particular contract, but rather ordered that it would approve for purposes of § 6j only those contracts which met certain criteria, leaving to Consumers the choice whether it would renegotiate its contract with the MCV and whether it would deal with any other particular QF.

The argument by Consumers and the MCV that the U-6798 proceeding was the only appropriate manner in which the PSC attempted to implement the PURPA in this state is without merit. The federal regulations allow the PSC to choose the manner in which it implements the PURPA, including case-by-case implementation.

There is also no merit to the argument of James River that the PSC unlawfully delegated the selection of QFs to Consumers. The PSC had no such authority to delegate. Consumers is free to deal with the QFs of its choosing, subject to the federal requirement that it pay full avoided costs in the event it is unable to negotiate another rate with the QF, and subject to § 6j of the state law disallowing the pass-through to ratepayers of capacity charges that are not approved by the PSC. For this reason, the *Ashbacker* doctrine is not applicable here, because there is no license, right, or privilege being doled out by the government.

III

A

The Attorney General and ABATE claim that the PSC erred, both as a matter of law and because the choice was not supported by substantial evidence on the whole record, in choosing a method of calculating Consumers' avoided capacity costs in which a coal-fired plant was used as a proxy.

Simply put, the coal-fired proxy method calculates avoided capacity costs by estimating the capacity costs which the utility would have incurred had it built a traditional coal-fired electric generating plant instead of buying capacity from QFS.

The Attorney General and ABATE note that the MCV cogenerator facility is the remnant of the failed Midland Nuclear Power Plant. They state that it is undisputed that after the failure of the nuclear generating venture, Consumers determined to turn the Midland plant into a conventional gas-fired electric generating plant. Although this intention was short-lived, because Consumers thereafter determined that it would be better to create a cogeneration venture using the Midland facility, they claim that Consumers' short-lived but real intention to use Midland as a conventional gas-fired generating facility means that, but for Consumers' purchases from QFS, Consumers would have refurbished and used the Midland facility as its next generation generating plant. Therefore, they claim that under the federal statute and regulations the PSC should have used a gas-fired proxy instead of a coal-fired proxy. However, they do not claim that the PSC should have used the existing Midland plant as the proxy, inasmuch as Consumers would have incurred unreasonably low costs in converting the Midland plant to a tradi-

tional gas-fired generating facility, with the result that the calculated avoided cost would be unreasonably low. Instead, they argue that it would be most equitable and most in keeping with the statutory intent if the PSC had used a so-called "greenfields" gas-fired proxy, i.e., a traditional gas-fired electric generating plant built from scratch.

The PSC responds that at least six different avoided cost methodologies were proposed and that it chose the coal-fired proxy approach only after sifting the record evidence and determining it was the best of the lot.

Moreover, the PSC argues that as a matter of law it was not required to use a gas-fired proxy. In the first place, a "greenfields" gas-fired proxy is just as hypothetical an entity as the coal-fired proxy, and it is far from clear that such a hypothetical gas-fired plant would in fact yield a lower avoided capacity rate. Second, the PSC claims that ABATE's interpretation of the statute and regulations leads to unacceptable results. If a state regulatory authority was required to use avoided costs based on the stated intent of a utility, it would be held captive to that utility's chosen method of meeting its future capacity needs, even if that method was inefficient or intentionally was chosen to lower the capacity cost payable to QFS.

B

In *Ass'n of Businesses Advocating Tariff Equity, supra* at 667-668, this Court held:

The parties have argued extensively regarding the proper standard of review. However, since this case involves more than one variety of PSC decision, more than one standard of review applies. The pure decision of the methodology for determining avoided costs, as adopted through the U-

6798 proceeding, is a clear example of legislative/ policymaking of the experimental ratemaking variety. Since federal law has mandated states to devise such methodologies, the action is lawful; and this Court has held that at least the policy advisability of the concept is beyond review, *Attorney General v Public Service Comm No. 2,* 133 Mich App 790, 799; 350 NW2d 320 (1984).

Even if the PSC's decision in this case is not completely beyond review, under MCL 462.25; MSA 22.44 all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed prima facie to be lawful and reasonable. A party attacking an order of the PSC must prove by clear and satisfactory evidence that the order complained of is unlawful or unreasonable. A reviewing court gives due deference to the PSC's administrative expertise and is not to substitute its judgment for that of the PSC. A party challenging the PSC's determinations must show the decision is arbitrary, capricious, unreasonable, an abuse of discretion, or not supported by the record. *Miller Bros, supra* at 231-232.

Under any of the above standards, the PSC's decision to use a coal-fired proxy must be upheld. This Court has held that a PSC decision is supported by substantial evidence if it is supported by expert opinion testimony, offered by a qualified expert who has a rational basis for his views, whether or not other experts disagree. *Great Lakes Steel Div of Nat'l Steel Corp v Public Service Comm,* 130 Mich App 470, 481; 344 NW2d 321 (1983). The PSC's decision was supported by the testimony of Michael J. Kidd, director of the PSC's gas division, regarding the volatility of the natural gas market, as well as by the testimony of Donald W. Johns, supervisor of the evaluation and depre-

ciation section of the PSC's technical services division.

The PSC's review of the various methodologies offered and its statement of the reasons for accepting the coal-fired proxy and rejecting the other methodologies demonstrate that its decision is not arbitrary, capricious, an abuse of discretion, or unreasonable.

Furthermore, a gas-fired proxy is not required here simply because Consumers intended to use the Midland facility as a traditional gas-fired electric generating facility before its determination to create a limited partnership and use it as a cogenerating facility. As noted by the PSC, this interpretation of the statute would give utilities too much incentive to manipulate avoided cost estimates and might allow them effectively to set those estimates. Moreover, we doubt that a facility can be both a QF and a future, but yet unbuilt, capacity addition to an electric utility.

IV

A

Although Consumers' projections showed a significant need for capacity in 1997 and beyond of at least 1,900 MW, the PSC found that, with twenty-three percent reserve margin, the company's forecast was supported by the record to the extent of 1,290 MW, while the staff's forecast using the same reserve margin supported a need of approximately 700 MW of capacity additions. Finding Consumers' forecast to be better supported by the record, the PSC reduced it by ten percent to err on the side of caution and arrived at a 1997 capacity need of 1,160 MW. The Attorney General argues that these decisions are not supported by substantial evidence

and are, in addition, arbitrary, capricious, an abuse of discretion, and unreasonable.

The Attorney General is also concerned that the PSC refused to consider record evidence that Consumers could and should implement demand-side options, such as conservation, to reduce the need for capacity through 1997 by approximately 125 MW. In addition, the Attorney General claims that evidence supports a finding that Consumers could have reduced needed capacity by at least 650 MW through purchased-power agreements.

Finally, the Attorney General claims that the PSC erred when it made a policy decision to choose a planning horizon through 1997. Noting the shorter construction lead times enjoyed by QFS, the Attorney General claims that the PSC should have chosen a shorter planning horizon so that actual increased demand could be better measured before the ratepayers were locked into potentially unnecessary capacity for 17.5 years.

While the Attorney General argues that the PSC approved too much capacity, Consumers argues that it approved too little. Consumers argues that the PSC's use of a 1,350 MW coal-fired proxy justifies approval of 1,350 MW of future capacity (which is the amount called for in Consumers' contract with the MCV). Consumers argues that proxies, just like real plants, cannot be built to match precisely the amount of future capacity projected, and in the instant case the PSC properly used a proxy plant consisting of two hypothetical 675 MW generating units, coming on line in 1997. Because this is the amount of capacity actually foregone by purchasing capacity from QFS, Consumers argues that the PSC erred in failing to use this as the basis for setting avoided capacity.

The MCV makes the additional argument that, even if the 1,290 MW in future capacity found by

the PSC is supported by the record, the PSC erred by arbitrarily reducing the 1,290 MW by ten percent in order to err on the conservative side. The MCV argues that if 1,160 MW is supported by the record, then the PSC should so find. If, on the other hand, 1,290 MW is supported by the record, it is error to arbitrarily reduce it by ten percent "just in case."

The PSC responds that the record contains two complete forecasts of need, by Consumers and the PSC staff. In addition, the record contains an analysis of need by Roy Alper, on behalf of several project developers, as well as an alternative prospective on projecting future demand by an ABATE witness, H. Clyde Allen. The PSC states that its forecast of capacity need falls within the ranges presented and is amply supported by the record.

The PSC states that it refused to consider possible demand-side programs, because Consumers' apparent foot dragging in this regard makes it impossible to plan on implementation of such strategies in the near term. Similarly, the PSC states that any possible savings through purchased power were speculative and could not be justified on this record.

The PSC argues that it is a non sequitur to claim that it must approve at least 1,350 MW in capacity because that is the size of the coal-fired proxy used in its calculations. The relation between the avoided capacity costs and the size of the plant used in its calculations is one of approximation only. The size of the coal-fired proxy depends in part on the availability of cost data regarding coal-fired generating units, which in turn depends upon the size of generating units actually built in the past or projected for the future.

The PSC defends its ten percent reduction in the amount of capacity it forecast for 1997. The PSC

notes that under 1987 PA 81 any capacity charge approval in this case results in increased cost to the ratepayers for a minimum of 17.5 years. It was therefore only prudent, argues the PSC, to reduce the estimated 1997 capacity need figure by ten percent in order to protect the ratepaying public from excess costs, especially in light of the fact that, if capacity need grows in the interim faster than expected, QF capacity can be added in relatively short order.

### B

"Substantial evidence" has been defined as evidence which a reasoned mind would accept as sufficient to support a conclusion. While it consists of more than a mere scintilla of evidence, it may be substantially less than a preponderance of the evidence. *Gersbacher v State Employees' Retirement System,* 145 Mich App 36, 46; 377 NW2d 334 (1985).

In the instant case, the PSC's determinations of the amount of future capacity and reserve margin are supported by substantial evidence. The amounts selected fall well within the range of values presented by the witnesses. Moreover, the choice of a planning horizon is a pure policy decision which, even if not immune from review, should only be disturbed if arbitrary, capricious, or an abuse of discretion. The PSC's choice of a ten-year horizon in this case cannot be said to be any of these. We similarly find no error in the PSC's reduction by ten percent of the amount of approved capacity. We agree with the PSC's reasoning and reject the argument that it must approve 1,350 MW in capacity on the basis of the size of the coal-fired proxy.

Finally, we reject the argument that the PSC

should have required Consumers to utilize demand-side and purchased-power options. The PSC found as fact that such options, while important, could not be implemented within the chosen ten-year planning horizon. Appellants have not demonstrated that this finding was in error.

v

A

Cogentrix claims that the PSC-approved average capacity charge of 3.77 cents/kWh is too low. In its January 31, 1989, opinion and interim order, the PSC used a formula to calculate avoided capacity cost. Cogentrix takes issue with certain of the inputs to that formula.

The PSC relied upon staff witness Boyd's testimony to arrive at a 1990 coal-fired proxy cost of $1,448 per kw, escalated by 3.7 percent per annum for construction completed after 1990. Cogentrix claims that this plant cost factor is too low. In the *Tondu,* case the commission found a 1984 unit cost of $1,250 per kw, which the commission held should be escalated by 4.2 percent per annum. Using these figures, Cogentrix claims that the 1990 unit cost should be $1,535 per kw, which is closer to figures arrived at by other expert witnesses testifying in this case. Cogentrix argues that because the capital cost rate used in the *Tondu* case was affirmed by this Court, it was unlawful and unreasonable for the PSC to deviate from that formula in this case.

Another of the factors in the formula used by the PSC is the so-called "fixed charge rate." In the instant case, the PSC adopted a fixed charge rate of 17.5 percent, which Cogentrix argues is too low. This contention is based solely on Cogentrix' claim that one factor in determining the fixed charge

rate, the debt cost for Consumers, is too low and is not consistent with economic realities regarding the cost of debt.

B

In *Ass'n of Businesses Advocating Tariff Equity, supra* at 668, the *Tondu* case, this Court held that while the choice of a method for calculating avoided capacity costs was a policy decision entrusted to the PSC and beyond direct review by this Court, other decisions, such as the choice of inputs for the avoided capacity cost formula, may be reviewed to determine whether they are arbitrary, capricious, unreasonable, or an abuse of discretion or whether the choice of inputs is supported by substantial evidence.

In reviewing the evidence presented regarding fixed charge rates, the PSC found that expert witnesses testified to a range of values, from a high of 19.332 percent to a low of 15.9 percent. After reviewing the various options offered, the PSC found that a rate of 17.5 percent was consistent with the testimony of staff witness Radke and that of Mr. Czahar, a private consultant testifying on behalf of numerous QFs. As already noted, a PSC factual finding is supported by substantial evidence if the evidence is offered by a qualified expert who has a rational basis for his views, even if other experts disagree. *Great Lakes Steel, supra.* Because the PSC's decision in the instant case is supported by expert testimony, it is supported by substantial evidence and, a fortiori, is not arbitrary, capricious, unreasonable, or an abuse of discretion.

The fact that the PSC found a plant cost in the *Tondu* case different from that found in the instant case is a simple result of the fact that both

numbers are estimates, as well as a function of the passage of time between the PSC's decision in the *Tondu* case and the instant case. Cogentrix is not entitled to a plant cost derived by updating the plant cost found in the *Tondu* case.

## VI

### A

After determining that the average capacity charge for QFS dealing with Consumers should be 3.77 cents/kWh, the PSC adjusted these charges on the basis of the type of fuel used by the QF. The PSC labeled the process "backloading," because it requires the utility to pay the QF a capacity charge which is a given percent less than 3.77 cents/kWh at the beginning of the backloading period, and then compensates for this by increasing the capacity charge by the given percentage at the end of the backloading period. In its January 31, 1989, opinion and interim order, the PSC held that projects fueled by municipal solid waste, water, wood, waste gas, and landfill gas were not subject to backloading. For projects fueled by natural gas and oil, the backloading was twenty-five percent. Finally, projects fueled by coal or peat were subject to a ten percent backloading factor. In its December 21, 1989, order, the PSC revised the amount of backloading for natural gas and oil projects, increasing it from twenty-five percent to forty percent.

Consumers complains that the PSC's attempt to justify backloading in its January 31, 1989, order was premised on impermissible considerations. In particular, Consumers complains that the general basis for the PSC's backloading decisions was its judgment regarding the social desirability of the technologies and fuel sources involved. Consumers

argues that nothing in the PURPA or the FERC's regulations empowers the PSC to make such social engineering decisions and that the PSC should stick to determining avoided costs.

Moreover, Consumers complains that there was no addition to record evidence and no reason given by the PSC for its change in the backloading percentage, from twenty-five percent to forty percent, for projects fueled by natural gas and oil. Consumers complains that this action therefore was arbitrary, capricious, and unreasonable.

The Attorney General argues that the PSC properly ordered backloading, but that it improperly reduced the backloading period from the entire thirty-five-year term of the contracts to 17.5 years.

B

Nothing in the PURPA or the FERC's regulations appears to require or prohibit state regulatory authorities from adjusting the capacity charge, so long as the total payments made to a QF are in line with the utility's total avoided cost in present value terms. Because the PSC is in effect determining the contract costs it will approve, if presented with such contracts, for purposes of pass-through to ratepayers, the backloading order falls within the PSC's complete power to regulate public utilities and their rates or other charges under MCL 460.6; MSA 22.13(6). This Court has held that when setting rates, the PSC is acting in a legislative capacity and its decisions may only be set aside if wholly unreasonable, i.e., unsupported by any evidence. *Attorney General v Public Service Comm*, 165 Mich App 230, 235; 418 NW2d 660 (1987).

In the instant case, the testimony of staff witness Johns supplied record evidence for the PSC's

determination that backloading was appropriate. In its January 31, 1989, opinion, the PSC found:

> The Commission finds that Mr. Johns' suggestion for backloading certain projects has merit and should be adopted, with some modifications. On the other hand, the Commission believes that frontloading should be rejected.
>
> The use of levelized payments, which equalizes the price Consumers will pay a qualifying facility over the life of the contract, when considered in light of the effects of inflation, leads to the conclusion that Consumers will be paying relatively more in the early years of the contract, but paying less in the later years. However, under PURPA it is sufficient that, in present value terms, total payments made pursuant to a contract with a qualifying facility not exceed the utility's total avoided cost. The timing of the payments is not dictated by PURPA because nothing in the law or the FERC's regulations requires or prohibits the use of levelized payments.
>
> The greater value of early-year payments associated with levelized payments constitutes a risk to Consumers' ratepayers that the qualifying facility will cease operating prematurely, thus depriving the utility and its ratepayers of a source of inexpensive power. Frontloading simply exacerbates the risk.
>
> Backloading all projects by 25% at the outset would reduce the risk to Consumers' ratepayers, but not all projects require backloading or the same degree of backloading. Therefore, the Commission believes it is appropriate to distinguish among qualifying facilities on the basis of their technologies, initial costs, future risks, and social benefits to determine whether, and to what extent, backloading is appropriate.

We find nothing unreasonable in the PSC's review of various factors associated with fuel type in determining the amount and necessity of backloading.

In its December 21, 1989, opinion and order, the
PSC changed the backloading percentage for gas-
and oil-fired projects from twenty-five percent to
forty percent, reasoning:

> In reviewing the record and circumstances of
> these consolidated cases, the Commission has con-
> cluded that greater protection against this risk is
> required and that capacity rates for projects using
> natural gas or oil should be backloaded by 40%.
> The avoided capacity cost rate would commence in
> 1990 at 2.26 cents per kwh and then escalate over
> a 17½ year period so that the qualifying facilities
> will receive an average present value capacity
> payment of 3.77 cents per kwh during that period.
> The Commission finds that this revision in the
> backloading of projects fueled by natural gas and
> oil will more nearly assure that the economic
> incentives and wherewithal for the projects to
> remain in operation will exist during the first 17½
> years of the life of these projects, when the capac-
> ity payments, are guaranteed. Commencing capac-
> ity payments at a rate comparable to that of a
> natural gas-fired plant proxy provides a capacity
> payment sufficient to permit the developers to
> finance and construct the plants. Increasing capac-
> ity payments, coupled with the avoided energy
> payments based on a coal plant proxy, should
> provide a sufficient revenue stream to keep natu-
> ral gas-fired facilities operating even if the price of
> natural gas rises sharply.

In other words, the PSC found that increasing the
backloading factor to forty percent in effect pro-
vided gas-fired QFS with initial capacity payments
at a rate comparable to that of a gas-fired proxy,
and thus more in line with the gas-fired QF's
probable initial start-up costs. Increasing the ca-
pacity payments in the later years would help
assure a sufficient revenue stream in the future
even if the price of natural gas rose sharply, thus

assuring Consumers and its ratepayers a stable source of electricity capacity from the gas-fired QFS. Therefore, the PSC's decision to increase the backloading factor for gas-fired and oil-fired QFS is not unreasonable.

We agree with the PSC that ordering backloading for the entire thirty-five-year life of a contract would violate the intent behind 1987 PA 81, which requires that capacity charges once approved may not be changed for a period generally set at 17.5 years.

VII

A

Energy Michigan notes that on many occasions the PSC found or at least strongly suggested that the contract between Consumers and the MCV was not the result of arms-length negotiations, but rather was more in the form of self-dealing, inasmuch as the MCV facility was once the Midland Nuclear Power Plant and the MCV is a limited partnership in which, at one time, Consumers had, and now its parent company has, a substantial interest. Energy Michigan complains that Consumers' actions have made it impossible for the goals of the PURPA to be realized regarding diversity of projects, fuels, and sizes. According to Energy Michigan, although the PSC determined that the MCV contract was the result of an absence of arms-length negotiation, it imposed no sanctions on Consumers for its discriminatory favoritism of the MCV and allowed Consumers to continue to do its best to benefit the MCV at the expense of other QFS.

In addition, Energy Michigan complains that a host of antitrust issues are raised by Consumers' actions in this case, including allegations of concerted refusal by Consumers to deal with some or

all of the QFS, its attempt in conjunction with the MCV to monopolize the relevant market, and a de facto vertical integration by Consumers which monopolizes or attempts to monopolize the relevant market, all in violation of the Sherman Antitrust Act, 15 USC 1 *et seq.*

## B

We conclude that Energy Michigan's arguments are without merit. Even if the PSC believed that the contract between Consumers and the MCV was more the product of self-dealing than arms-length negotiations, Energy Michigan fails to state what additional sanctions the PSC could or should have applied. Sanctions aside, the PSC determined that the MCV contract contained too high a price and committed Consumers to buying too much capacity for purposes of pass-through to ratepayers. If the price and amount agreed to in the contract was the result of self-dealing, then the PSC's ultimate decision dealt with this concern. Absent some authority by the PSC to fine utilities for wrongful conduct, it is not clear what else the PSC could have done under the circumstances.[6]

Whatever the merits of Energy Michigan's antitrust arguments, the proper forum for raising such arguments is a court and not the PSC.

## VIII

Because of our holding in § II(B) above, we find it unnecessary to address in detail other issues raised by the parties. The PSC did not err when it rescinded its previous decision to limit to fifty-five percent the allocation of capacity to any single QF,

[6] We note that certain questions regarding Consumers' interest in the MCV are presently before this Court in a separate appeal.

because it never possessed such authority, just as it never had authority to limit the amount of capacity which could be supplied by any one fuel type. Similarly, the PSC is without authority to order Consumers to enter into any particular contract, except insofar as the PSC is presented with a complaint by a QF that Consumers has unmet capacity which it refuses to purchase from the QF at full avoided cost. In this case, however, it appears that Consumers contracted to fill all its unmet capacity with the MCV and Ada Cogeneration, although its contract price with the MCV was found excessive and thus disallowed under § 6j.

We remand this case to the PSC for further consideration not inconsistent with this opinion. On remand the PSC shall also clarify whether it calculated the avoided capacity cost as of the date the obligation between the MCV and Consumers was incurred and whether all factors contained in 18 CFR 292.304(e) have been considered in setting avoided cost. We do not retain jurisdiction.