MIDLAND COGENERATION VENTURE LIMITED PARTNERSHIP
v PUBLIC SERVICE COMMISSION

CONSUMERS POWER COMPANY v PUBLIC SERVICE
COMMISSION

Docket Nos. 124705, 128175. Submitted April 22, 1992, at Lansing. Decided April 19, 1993, at 9:00 A.M.

The Public Service Commission, in consolidated proceedings related to Consumers Power Company's natural gas transportation services, 1987 application for a gas rate increase, and 1988 application for a revision of its gas plant and equipment depreciation rates, ordered a reduction in gas rates and established tariff rates for the utility's intrastate gas-transportation services. In addition, the commission required Consumers to ensure future access by the commission's staff to the books and records of Consumers' holding company, CMS Energy Corporation, and each of Consumers' corporate affiliates and joint ventures; to furnish the commission with financial statements of the holding company and Consumers' affiliates, subsidiaries, and joint ventures; and to file various annual statements and reports regarding Consumers' transactions with affiliates, subsidiaries, and joint ventures. The commission also directed Consumers, its holding company, and its affiliates, subsidiaries, and joint ventures to employ certain accounting procedures and controls and to keep their financial records in a manner consistent with general accounting principles. Consumers and Midland Cogeneration Venture Limited Partnership, which sells electricity to Consumers, purchases natural gas from Consumers, and one of whose general partners is CMS Midland, Inc., a wholly owned subsidiary of CMS Energy Corporation, appealed. The appeals were consolidated.

The Court of Appeals held:

1. MCL 460.55; MSA 22.5 authorizes the Public Service Commission to require a regulated utility to provide informa-

REFERENCES

Am Jur 2d, Public Utilities §§ 235, 272.

Propriety of considering capital structure of utility's parent company or subsidiary in setting utility's rate of return. 80 ALR4th 280.

tion regarding the utility's parent corporation and nonregulated affiliates where such information is reasonably necessary for the performance of the commission's regulatory duties.

2. MCL 460.56; MSA 22.6 authorizes the commission to examine any books, accounts, and records kept on behalf of a utility subject to its jurisdiction and to require the production of any books, papers or records relating to the management or operation of the utility. Such books, papers, or records need not actually belong to or be in the possession of the regulated utility.

3. There is no statutory authority for the commission's imposition of accounting and bookkeeping requirements on a nonregulated entity such as the Midland Cogeneration Venture Limited Partnership. Mcv's separate identity may not be disregarded in the absence of evidence that MCV operates as a mere instrumentality, agent, or adjunct of Consumers for an improper purpose such as avoiding Consumers' legal obligations or investigation and control by the commission.

4. The question whether the commission, in setting intrastate gas-transportation rates, was preempted by federal law from considering revenues received by Michigan Gas Storage Company, a Consumers' subsidiary, from certain interstate gas-transportation services is not ripe for decision in view of the fact that Consumers is not at this time aggrieved by the commission's action because no refunds or credits to ratepayers has been ordered.

5. MCL 460.6; MSA 22.13(6) and MCL 460.54; MSA 22.4 authorize the commission to require that all on-system gas transportation be performed pursuant to the newly established transportation tariffs rather than individual contracts with transportation customers as filed with the commission.

6. The commission did not render an unlawful or unreasonable decision in disallowing as an operating expense a portion of the sum paid by Consumers for bill collection services to Selective Collection Services, a sister subsidiary of Consumers. Consumers failed to establish a good business reason for transferring its debt collection activities to an unregulated subsidiary and that the costs associated with that decision were reasonable, and the commission's decision was supported by competent, material, and substantial evidence.

7. The commission's refusal to offset a portion of the gain realized by Consumers from the sale of certain pension fund assets against expenses incurred in a special-compensation program was not unreasonable or unlawful. Consumers did not incur any actual cash expense in these transactions, and the

special-compensation expense was a nonrecurring expense of the type that generally is not considered for rate-making purposes.

8. The commission did not act unlawfully or unreasonably in imputing to Consumers revenues associated with certain distribution charge discounts Consumers had extended to large, new industrial customers pursuant to an economic-development rate approved by the commission in 1985. The imputation of revenue was consistent with the commission's requirement in its 1985 order that Consumers' other classes of customers not subsidize the economic-development rate charged to the industrial customers.

Affirmed as modified.

TAYLOR, J., dissenting in part, stated that the Public Service Commission lacks statutory authority to force Consumers to provide the financial records of those of its affiliates and subsidiaries that are not within the commission's regulatory jurisdiction, and the commission lacks statutory power to require Consumers to set its prices for the initial on-system gas transportation contracts pursuant to the new tariff schedule rather the initial contracts filed with the commission. Furthermore, inquiry into whether there was a good business reason for bill collection services by a Consumers affiliate is improper, and the "reasonable utility management" test should be applied in determining whether expenses related to those services were reasonable. The commission also improperly refused to offset the entire gain realized from the sale of pension fund assets against contemporaneously incurred expenses, and improperly imputed to Consumers revenues associated with the economic-development rate in the absence of any evidence that Consumers' other customers were subsidizing the rate paid by the large, new industrial customers.

1. PUBLIC UTILITIES — PARENT COMPANIES — AFFILIATES — SUBSIDIARIES — PUBLIC SERVICE COMMISSION.

The Public Service Commission may require a regulated utility to provide information regarding the utility's parent corporation and nonregulated affiliates and subsidiaries where such information is reasonably necessary for the performance of the commission's regulatory duties (MCL 460.55; MSA 22.5).

2. PUBLIC UTILITIES — RECORDS — PUBLIC SERVICE COMMISSION.

The Public Service Commission may examine any books, accounts, and records kept on behalf of a utility subject to its jurisdiction and may require the production of any books,

papers, or records relating to the management or operation of the utility (MCL 460.56; MSA 22.6).

*Steven H. Lasher, George, Van Dam & Camp, P.C.* (by *Philip Van Dam*), and *Foster, Swift, Collins & Smith, P.C.* (by *William K. Fahey, Stephen O. Schultz,* and *Glen A. Schmiege*), for Midland Cogeneration Venture Limited Partnership.

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *George W. Loomis, Ronald W. Bloomberg,* and *Sherri A. Wellman*), and *David A. Mikelonis, Robert M. Neustifter,* and *James P. Melia,* for Consumers Power Company.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Don L. Keskey* and *William W. Derengoski,* Assistant Attorneys General, for Public Service Commission.

*Hill Lewis* (by *Nancy L. Lukey* and *Donna M. Canada*), for Association of Businesses Advocating Tariff Equity.

Before: MCDONALD, P.J., and WAHLS and TAYLOR, JJ.

MCDONALD, P.J. Consumers Power Company and Midland Cogeneration Venture Limited Partnership (MCV) appeal as of right a December 7, 1989, order of the Public Service Commission (PSC), and related orders subsequently entered by the PSC. The PSC and the Association of Businesses Advocating Tariff Equity (ABATE) respond as appellees.

The consolidated proceedings below covered PSC Docket Nos. U-8678, U-8924, and U-9197. Docket No. U-8678 was commenced in February of 1987 by the PSC, on its own motion, for the purpose of investigating and regulating Consumers' provision

of gas-transportation services. Docket No. U-8924 is a gas rate case instituted by Consumers' November 1987 application for an annual rate increase of not less than $2.2 million. Docket No. U-9197 was commenced in August of 1988 on Consumers' application to revise its gas plant and equipment depreciation rates.

Among other things, the PSC ordered a reduction in Consumers' retail gas rates by approximately $28.4 million annually, established tariff rates for the utility's intrastate gas-transportation services, and imposed a number of information access and reporting "conditions" for future cases. The PSC's conditions require Consumers to ensure PSC access to the books and records of its holding company, CMS Energy Corporation (CMS), and each of the utility's corporate affiliates and joint ventures, furnish the PSC with certain financial statements of the holding company and nonutility subsidiaries, and file various annual statements and reports regarding the utility's interaffiliate transfers and transactions. Additionally, the conditions direct Consumers, CMS, and Consumers' subsidiaries and joint ventures to employ certain accounting procedures and controls and keep their books in a manner consistent with general accounting principles.

In its appeal, MCV challenges only the conditions imposed by the PSC, to the extent that they directly apply to MCV as an affiliate or joint venture of Consumers. Consumers' appeal challenges the conditions and raises five issues concerning the gas sales and transportation rates set by the PSC.

I

Consumers reorganized its corporate structure in 1987. CMS was formed as a parent corporation,

holding Consumers as its principal subsidiary. New subsidiaries were formed and Consumers transferred a number of its subsidiaries to its parent and sister subsidiaries. For example, an affiliate corporation, Selective Collection Services (SCS), which is engaged in the business of collecting past-due utility bills for Consumers and other utility companies, is a former Consumers subsidiary that was transferred pursuant to the corporate reorganization.

During the course of these proceedings, the PSC's staff indicated that its investigation of Consumers' dealings with its corporate affiliates was frustrated because the staff had been denied access to the records of affiliates such as SCS when the staff sought to compare the rates SCS charged to Consumers with the rates it charged to other utilities. The staff's senior economist testified that Consumers' corporate reorganization raises regulatory concerns about possible cross-subsidization of nonutility investments through utility rates and recommended the imposition of certain reporting, bookkeeping, and information-access conditions covering Consumers' holding company, sister subsidiaries, affiliates, and joint ventures to enable the staff to investigate these concerns in future cases.

In its December 7, 1989, order, the PSC, with slight modification, adopted the following seven conditions proposed by its staff:

> 1. That the utility ensure that the Commission has access to books and records of the holding company and each of its affiliates and their joint ventures. Any objections to not providing all books and records must be raised before the Commission and the burden of showing that the request is unreasonable or unrelated to the proceeding is on the respondents.
> 2. Each utility, holding company, and each of its

subsidiaries and the joint ventures of the holding
company and/or its subsidiaries shall employ ac-
counting and other procedures and controls re-
lated to cost allocations and transfer pricing to
ensure and facilitate full review by the Commis-
sion and to protect against cross-subsidization of
non-utility activities by the utility's customers.

3. The holding company and each of its subsid-
iaries and the joint ventures of the holding com-
pany and/or its subsidiaries shall keep their books
in a manner consistent with general accounting
principles and, where applicable, consistent with
the Uniform System of Accounts.

4. The utility shall furnish the Commission with:

a. The quarterly and annual financial state-
ments of the consolidated utility and/or its parent
holding company;

b. Annual statements concerning the nature of
intercompany transactions concerning the utility
and a description of the basis upon which cost
allocations and transfer pricing have been estab-
lished in these transactions;

c. Annual balance sheets and income statements
of the non-regulated subsidiaries of the utility
and/or the non-consolidated subsidiaries of the
holding company.

d. The utility shall submit, as a separate exhibit
in its next general rate case an audit report of its
transactions between the utility and its non-utility
affiliates;

e. Provide federal income tax on a consolidated
or non-consolidated basis depending on filing.

5. The utility shall avoid a diversion of manage-
ment talent that would adversely affect the utility.
An annual report identifying personnel trans-
ferred from the utility to non-utility subsidiaries is
required.

6. The utility shall notify the Commission in
writing within thirty days prior to any transfer to
non-utility affiliates of any utility assets or prop-
erty exceeding a fair market value of $100,000.
Asset transfers from regulated to non-regulated
shall be at the higher of cost or fair market value

and non-regulated to regulated shall be at the lower of cost or fair market value. That all services and supplies provided by non-regulated enterprises shall be at market price or 10% over fully allocated cost, whichever is less.

7. Market, technological, or similar data transferred, directly or indirectly, from the utility to a non-utility affiliate shall be transferred at the higher of cost or fair market value.

Conditions 1, 2, 3, and 4(a)-(c), without modification, were imposed on the activities of CMS and Consumers' nonregulated affiliates and joint ventures. However, the PSC modified conditions 4(d), 4(e), 5, 6, and 7 to require only that Consumers file annual reports covering the subject matters discussed in those conditions.

Although MCV had not been a party to the proceedings up to that point, it filed a claim of appeal from the PSC's decision, challenging the PSC's authority to impose conditions upon MCV should it be deemed an "affiliate" or "joint venture" covered by the first three conditions. Mcv is a limited partnership created in 1987 for the purpose of constructing and operating a gas-fired electric cogeneration facility at the site of Consumers' abandoned Midland nuclear power plant. CMS Midland, Inc., a wholly owned subsidiary of CMS, is a general partner in MCV and holds a forty-nine percent voting interest in the partnership. CMS or its subsidiaries also hold various debt securities and contractual obligations of MCV. Consumers is a major purchaser of power from MCV, as well as a supplier of natural gas to the cogeneration facility.

Mcv moved for peremptory reversal, arguing that the PSC failed to provide adequate notice of its intent to impose the conditions in the rate proceedings or make adequate findings of fact in support of imposing the conditions, that it is a

qualifying cogeneration facility under the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 USC 823a *et seq.*, and that federal law preempts the PSC from attempting to regulate its affairs through the imposition of conditions. In response to MCV's motion, this Court remanded the case to the PSC for further proceedings and for the preparation of a supplemental opinion clarifying whether MCV is an "affiliate" or "joint venture" covered by the conditions, and if so, explaining the necessity and authority for imposing the conditions on MCV.

The PSC issued its supplemental opinion on August 30, 1990, after hearing additional testimony offered by MCV, the Attorney General, and the PSC's staff. Noting that only the first three conditions were at issue with regard to MCV, the PSC explained that its intent was to apply the conditions to all of the entities over which CMS has exerted or could exert control to such a degree that there is a potential for abuse of Consumers' ratepayers for the profit of CMS, not on the basis of the identity or legal status of the entities involved, but because of the activities and transactions that they perform in concert. The PSC further stated that the conditions are properly interpreted as applying to MCV, finding that MCV is effectively controlled by CMS and Consumers despite the lack of a majority voting interest in the partnership. The PSC explained that condition 1 requires Consumers to ensure PSC access to the books of MCV to the extent it has the ability to do so, but this condition may be modified in the future if events demonstrate that CMS and Consumers are no longer able to direct the activities of MCV. Although the PSC found that the record-keeping requirements of conditions 2 and 3 apply directly to MCV, the PSC found that MCV's record and bookkeeping

procedures are already in compliance with condition 3 and that it is not necessary to impose any additional requirements on MCV under condition 2. The PSC found that the conditions are necessary to provide information on all sides of Consumers' interaffiliate transactions in order for the PSC to establish and maintain just and reasonable rates. The PSC's statutory authority to order production of books, records, and documents and to compel the attendance of witnesses under § 23 of the Railroad Commission Act, 1909 PA 300, MCL 462.23; MSA 22.42, and § 6 of the Public Utilities Commission Act, 1919 PA 419, MCL 460.56; MSA 22.6, was cited as legal authority for the conditions imposed. Finally, the PSC concluded that the reporting and information-access requirements in no way constitute regulation of MCV that would be inconsistent with the PURPA, stating that MCV's status as a qualifying facility under the PURPA does not immunize it from complying with the law and procedural rules applicable to discovery.

At oral argument, MCV indicated that its appeal is limited to conditions 2 and 3, given the PSC's clarification on remand that the obligation to ensure access to books and records under condition 1 is directed at Consumers, not MCV. Consumers announced its intention to withdraw from its appeal its challenge to any and all of the conditions. The PSC opposed the withdrawal, noting that the issue of the PSC's authority to order discovery regarding Consumers' holding company and affiliates is a recurring one. We agree with the PSC that the propriety of all seven conditions should be reviewed at this time.

The PSC possesses no common-law powers but is a creature of the Legislature, and all of its authority must be conferred by clear and unmistakable language in specific statutory enactments, because

doubtful power does not exist. *Union Carbide Corp v Public Service Comm,* 431 Mich 135, 146, 151; 428 NW2d 322 (1988); *Consumers Power Co v Public Service Comm,* 189 Mich App 151, 176; 472 NW2d 77 (1991). Moreover, the PSC's general power to fix and regulate rates does not carry with it, either explicitly or by necessary implication, the power to make management decisions. *Union Carbide, supra* at 148.

Turning first to those conditions that are directed solely at Consumers, we note that conditions 4 through 7, as adopted in modified form by the PSC, simply require Consumers to furnish certain financial statements and file various periodic reports regarding its parent corporation and nonregulated affiliates and its transactions with them. We find these conditions to be authorized by § 5 of the Public Utilities Commission Act, MCL 460.55; MSA 22.5, which provides, in clear and unmistakable language, specific statutory authority for the regulatory agency to require any regulated public utility to make such reports and supply such data as is reasonably necessary for the proper performance of its regulatory duties:

> In addition to the reports now required to be made by any public utility under the laws of the state relating to the Michigan railroad commission, it shall be competent for the public utilities commission to require the making of such additional and further reports and the supplying of such data as is reasonably necessary for the proper performance of the powers and duties hereby contemplated. Any report required to be made by a utility operated and controlled by a corporation, joint stock company or association shall be verified by the affidavit of the president and secretary thereof. In all other cases such verification shall be made by the owner, or one [1] of them, or by the general manager. Said commission shall have

power and authority to make, adopt and enforce rules and regulations for the conduct of its business and the proper discharge of its functions hereunder, and all persons dealing with the commission or interested in any matter or proceedings pending before it shall be bound by such rules and regulations. The commission shall also have authority to make and prescribe regulations for the conducting of the business of public utilities, subject to the jurisdiction thereof, and it shall be the duty of every corporation, joint stock company, association or individual owning, managing or operating any such utility to obey such rules and regulations. Any such corporation, joint stock company, association or individual refusing or neglecting so to do, or refusing or neglecting to make any report required hereunder, shall be liable to a penalty of not less than one hundred [100] dollars, nor more than one thousand [1,000] dollars; and the officer or individual in default shall also be deemed to be guilty of a misdemeanor and upon conviction thereof shall be subject to a fine of not less than ten [10] dollars nor more than one thousand [1,000] dollars, or to imprisonment in the county jail not more than six [6] months, or both such fine and imprisonment in the discretion of the court.

This statutory grant of authority and all of the other rights, powers, and duties of the former Public Utilities Commission were transferred to the PSC under § 4 of the Public Service Commission Act, 1939 PA 3, MCL 460.4; MSA 22.13(4). We find that the statutory language quoted above authorizes the PSC to require a regulated utility to provide information regarding the utility's parent corporation and nonregulated affiliates where such information is reasonably necessary for the proper performance of the PSC's duties. There are many instances where information about nonregulated parent and affiliated corporations conceivably

could be reasonably necessary for the PSC's proper performance of its duties. In the proceedings below, witnesses for the Attorney General and the PSC staff testified in detail regarding the PSC's need for information on both sides of interaffiliate transactions to determine the reasonableness of cost allocations and claimed operating expenses, and to ensure that Consumers' ratepayers do not subsidize nonutility operations.

There is also statutory authority for condition 1, which provides that in addition to furnishing the PSC with information regarding its holding company and affiliates, Consumers must also ensure that the PSC has access to the books and records of its parent company, affiliates, and joint ventures, to the extent Consumers has the ability to do so. Section 6 of the Public Utilities Commission Act, MCL 460.56; MSA 22.6, authorizes the PSC to examine any books, accounts, and records "kept on behalf" of any public utility subject to its jurisdiction and to require, by order or subpoena, the production of any books, papers, or records "relating to the management or operation of" any such utility:

> Said commission shall have authority to examine, or cause to be examined, the books, accounts and records kept on behalf of any public utility subject to the jurisdiction thereof. For the purpose of making such examination any member of the commission or any examiner or employee thereof shall be given free and full access to said books, accounts and records. Any person, or persons, in any way preventing or obstructing such examination or interfering with the person or persons authorized to make the same shall be deemed guilty of a misdemeanor. It shall also be competent for the commission to require by order or subpoena, which may be served in the same manner as is a subpoena issued out of the circuit court,

the production of any books, papers or records
relating to the operating or management of any
such utility. The owner or manager or the officers
of any corporation, company, or association, own-
ing or operating any such utility, may likewise be
summoned to appear before the commission to
answer such questions as may be put to him
touching the operation and business of such util-
ity. Neglect or refusal to obey any such order or
subpoena or refusal to testify shall render the
person or persons in default guilty of a misde-
meanor. Said commission may also apply to any
circuit court of the state for compulsory process to
enforce any such order or subpoena, and said court
shall have jurisdiction to compel obedience in the
same manner as compliance with an order of the
court might be enforced under the laws of the
state pertaining thereto.

We find nothing in the statutory language that
necessarily requires that books and records held
on behalf of a utility or relating to the operation
or management of its business actually belong to
or be in the possession of the regulated utility
itself.[1] It is at least conceivable that Consumers'
parent, affiliates, or joint ventures could hold some
papers, books, or records on behalf of Consumers
or relating to its management or operation, to
which the PSC may desire access at some point.

We do not now attempt to determine which
books and records of the parent or the affiliates
are covered by this statute or precisely define the
circumstances under which such books and records
are kept "on behalf of" a utility or "relate to" the
utility's management or operation for purposes of
the statute. The PSC's condition 1 provides a proce-
dure for Consumers to object that the PSC's specific

[1] Compare § 28(d) of the Railroad Commission Act, MCL 462.28(d);
MSA 22.47(d), where the authority to require production of relevant
books, papers, and accounts contains the qualification "kept *by* such
railroad." (Emphasis added.)

requests for materials are unreasonable or unrelated to the proceedings at hand. Any objection that the requested records are neither kept on Consumers' behalf nor relate to Consumers' management or operation may be raised and decided through that procedure, as well as any question of improper disclosure of confidential or proprietary information. Furthermore, we do not address the ability of the PSC to obtain parent or affiliate books or records through the issuance of a summons or subpoena under the provisions of the Public Utilities Commission Act, the Administrative Procedures Act, MCL 3.560(101) *et seq.*; MSA 24.201 *et seq.*, or other statutes and rules, the PSC's conditions having been imposed by neither summons nor subpoena in this case.

We now turn to conditions 2 and 3, which are the subject of MCV's appeal. Unlike the conditions imposing reporting and information-access requirements on Consumers, we are unable to find any statutory grant of authority that would allow the PSC to impose accounting and bookkeeping requirements directly on MCV. While the PSC's discovery authority may extend to books and records held by Consumers' affiliates and joint ventures, it does not necessarily follow that the PSC has authority to control the bookkeeping practices of these nonregulated entities. Indeed, the very same witness for the PSC staff who proposed the conditions testified on remand that the PSC lacks authority to directly impose these requirements on nonregulated entities such as MCV. Moreover, the choice of accounting and bookkeeping methods to be employed by a business is a managerial decision. It is not enough to state that employment of standardized accounting practices by MCV is necessary to develop an audit trail to facilitate the PSC's review of intercompany transactions for purposes of set-

ting Consumers' rates, or other proper regulatory
purposes. As noted in *Union Carbide, supra,* the
fact that certain management practices might
make the regulatory process lengthier and more
difficult does not alone justify the PSC's interfer-
ence with management decisions. 431 Mich 149.
Rather, there must be clear and unmistakable
statutory authority for the PSC's action.[2]

Section 6 of the Transmission of Electricity
Through Highways Act, 1909 PA 106, MCL
460.556; MSA 22.156, does grant the PSC discretion
to "prescribe uniform methods of keeping accounts
to be observed by all persons, firms, or corpora-
tions engaged in [the] business of transmitting and
supplying electricity." However, under the PURPA,
qualifying cogeneration facilities such as MCV are
generally exempt from the rate, financial, or orga-
nizational regulations imposed upon electric utili-
ties by state regulators. 18 CFR 292.602(c).[3] The
PSC also has specific statutory authority under § 13
of 1929 PA 9, MCL 483.113; MSA 22.1323, to
"prescribe the manner and the form or system of
accounts, financial records and operating memo-
randa or data to be set up and kept by all common
purchasers and common carriers of natural gas."
Mcv does regularly purchase gas for use at its
cogeneration facility. However, in order to be a
"common purchaser" or "common carrier" subject
to Act 9, MCV must also be engaged in the business

[2] We do not make any determination at this time whether the PSC's
authority under § 210(f) of the PURPA, 16 USC 824a-3, to implement
federal rules and regulations regarding transactions between qualify-
ing cogeneration facilities and electric utilities may authorize the PSC
to regulate MCV's accounting and bookkeeping practices, because no
such rule implementation was involved in these proceedings relating
to Consumers' gas service.

[3] We find it unnecessary to address whether the PURPA also exempts
MCV from other types of state regulation, because we conclude that
there is simply no statutory authority for the PSC to regulate MCV's
accounting and bookkeeping in any event.

of selling or transmitting gas that it purchases. MCL 483.104; MSA 22.1314, MCL 483.106; MSA 22.1316. Here, there is no indication that MCV uses its purchased gas for anything other than its own consumption. Similarly, the various provisions of the Railroad Commission Act cited on appeal by the PSC and ABATE relate to the power to require information from regulated "common carriers," a term that has no application to MCV. MCL 462.3(a); MSA 22.22(a). That portion of § 5 of the Public Utilities Commission Act, quoted above, that authorizes the PSC to adopt rules and regulations for the conduct of its business and the proper discharge of its function, and make such rules and regulations binding on "all persons dealing with the commission or interested in any matter or proceeding pending before it," arguably allows the PSC to impose conditions on nonregulated entities to facilitate relevant discovery in cases before it. However, in *Union Carbide, supra,* the Supreme Court indicated that this statute refers to rules and regulations that have been properly promulgated by the PSC, as opposed to conditions imposed in the final order of the PSC in a contested case. 431 Mich 152. Additionally, it is questionable whether a business becomes "interested" in PSC proceedings simply by being an affiliate or joint venture of Consumers. Finally, the broad language of § 6 of the Public Service Commission Act, MCL 460.6; MSA 22.13(6), provides no support for the PSC's conditions, because the statute merely serves as an outline of the PSC's jurisdiction, not as a grant of specific authority or powers. 431 Mich 147; *Huron Portland Cement Co v Public Service Comm,* 351 Mich 255, 263; 88 NW2d 492 (1958).

Absent specific statutory authority, the PSC's determination that CMS and Consumers control MCV does not authorize the PSC to regulate MCV's

accounting and bookkeeping practices as it would a regulated utility. In order for the PSC to disregard MCV's separate identity, MCV must operate as a mere instrumentality, agent, or adjunct of Consumers designed for an improper purpose such as avoiding Consumers' legal obligations or investigation and control by the PSC. *Yankoviak v Public Service Comm,* 349 Mich 641, 648-649; 85 NW2d 75 (1957); *People ex rel Attorney General v Michigan Bell Telephone Co,* 246 Mich 198, 204; 224 NW 438 (1929). It is true that this Court has previously upheld the PSC's treatment of Consumers and CMS as one, where Consumers had transferred its Midland plant assets to CMS in order to avoid regulation of proceeds generated from the subsequent sale of those assets to MCV. *CMS Energy Corp v Attorney General,* 190 Mich App 220, 232; 475 NW2d 451 (1991). However, MCV was not involved in that intercompany transaction. Consumers and MCV may share common interests and act in concert, but MCV does not appear to be a mere instrumentality of Consumers, nor did the PSC make any express finding that it was. Moreover, it cannot be said that MCV was established as a separate entity for the purpose of avoiding regulation by the PSC; rather, MCV was formed for the purpose of operating a qualifying cogeneration facility, which under the PURPA must exist independently of Consumers. See 18 CFR 292.206.[4] Nor can it be said that MCV is subject to PSC regulation because it conducts an integral part of Consumers' business as a public utility. See *Michigan Gas Storage v Public Service Comm,* 405 Mich 376, 392; 275 NW2d 457 (1979); *Michigan Bell Communications, Inc v Public Ser-*

[4] This is not to say that the PSC may not disregard MCV's separate identity for certain purposes where a proper factual predicate exists; for example, if MCV were to adopt new accounting and bookkeeping procedures for the purpose of assisting Consumers to avoid investigation and regulation by the PSC.

*vice Comm,* 155 Mich App 40, 48-52; 399 NW2d 49 (1986).

ABATE argues that by requiring consistency with general accounting principles and the development of internal procedures and controls for the allocation of costs and the pricing of goods and services, the PSC is requiring MCV to do that which is reasonably expected to occur in the normal course of business. The PSC argues that because the conditions do not impose any specific requirements beyond what MCV already does in the course of business, MCV lacks standing to appeal because it is not aggrieved by the conditions. We find these arguments unpersuasive. A party is aggrieved by a judgment or order when it operates on the party's rights and property, or bears directly on the party's interest. *Grace Petroleum Corp v Public Service Comm,* 178 Mich App 309, 312; 443 NW2d 790 (1989). Here, conditions 2 and 3 affect MCV's right to control its accounting and bookkeeping practices, and MCV is therefore aggrieved by the PSC's order. Although the PSC's conditions do not require MCV to change its current accounting or bookkeeping practices, they do prohibit MCV from changing those practices if it so desires. Accordingly, we hold that conditions 2 and 3 are inapplicable to MCV.[5]

II

Consumers argues that the PSC is preempted by federal law from considering revenues received by its subsidiary Michigan Gas Storage Company (MGS) from "at risk" interstate gas-transportation service when the PSC sets intrastate rates. In 1985,

[5] We express no opinion with respect to the validity of conditions 2 and 3 to the extent they apply to Consumers' other affiliates and joint ventures not represented in this appeal.

the Federal Energy Regulatory Commission (FERC)
issued Order No. 436, 50 Fed Reg 42408 (1985).
Essentially, the rule was designed to encourage
pipelines to provide natural-gas transportation ser-
vices to third parties, even though the transported
gas may be sold in competition with their own.
The rule provides for the FERC to set interstate
gas-transportation rates using projected or repre-
sentative levels of service in order to encourage
pipelines to provide as much of this "open access"
or "at risk" transportation service as possible, by
allowing pipelines to retain revenues earned in
excess of projected levels rather than passing the
earnings along to other customers of the utility in
the form of credits. In *Associated Gas Distributors
v Fed Energy Regulatory Comm,* 263 US App DC
1; 821 F2d 981 (1987), cert den 485 US 1006 (1988),
the court generally approved the rule, but vacated
it on grounds that the FERC had failed to ade-
quately address certain issues, such as the effect
on the pipelines' "take or pay" contractual liabili-
ties. The FERC has subsequently issued interim
orders upholding various provisions of the rule.

Consumers excluded all rate base, revenue, and
expense effects related to "at risk" transportation
sales from its projection of MGS' cost of service for
purposes of calculating Consumers' test-year net
operating income. In addition to other adjust-
ments, the PSC staff recommended including all of
MGS' transportation revenue and expenses in MGS'
cost of service projection. The staff also recom-
mended an expansion of the PSC's preexisting "90/
10" refund program to require refunding of certain
transportation revenues received by MGS in excess
of $547,000 (the projected revenue figure set by the
FERC). In his proposal for decision, the hearing
referee adopted both the PSC's staff's adjustments
to MGS' costs of service and the proposed extension

of the 90/10 refund program. However, the PSC found that the proposed expansion of the 90/10 refund program was not necessary, noting the relatively unsettled state of federal regulation in the area of interstate gas transportation. Still, the PSC included in MGS' cost of service the expenses and revenues associated with MGS' open-access transportation program at the projected levels established by the FERC.

We agree with the PSC that Consumers' federal preemption issue is not properly before the Court at this time. Because both the total cost of service for MGS' transportation customers and the total transportation revenue were included at the projected levels set by the FERC, i.e., $547,000, the net result is a wash, as Consumers conceded at oral argument. It follows that Consumers is not aggrieved by the PSC's order in this regard. The PSC has made no adjustments to the rates and projections established by the FERC and none of MGS' open-access transportation revenues have been refunded or credited to the utility's other customers. The fact that the PSC "left the door open" for consideration of refunds or credits in future cases is insufficient to make the issue ripe for decision in this appeal. *Grace Petroleum Corp, supra* at 313. Accordingly, we do not reach the federal preemption issue and express no opinion regarding its merits.

### III

Consumers next challenges the PSC's requirement that all on-system gas transportation be performed pursuant to the newly established transportation tariffs. Before the PSC's orders in this case, Consumers had provided gas transportation services by entering into individual contracts

with transportation customers and filing those contracts with the PSC pursuant to § 10 of 1929 PA 9, MCL 483.110; MSA 22.1320, which provides:

A common purchaser or common carrier of natural gas, before receiving the gas for transmission or delivery, shall file with the commission a schedule of the rates and price at which the common purchaser or common carrier will receive gas at delivery stations from a well, field, or source of supply, as well as the rates or charges at which the common purchaser or common carrier will deliver gas to connecting carriers or distributing lines or customers, and, if the common purchaser or common carrier is operating as a carrier for hire, the rates and charges which the common purchaser or common carrier will charge for the service to be performed by it. A common purchaser or common carrier operating as a carrier for hire also shall file a copy of each contract for purchasing, receiving, or supplying gas. The price to be paid and the rates and charges shall be stated and set up in the manner and form required by the commission and outlined in the rules of the commission for filing of rates of artificial gas utilities or pursuant to rules and conditions of service adopted by the commission, which the commission may make for the regulation of common purchasers and common carriers of natural gas. Thereafter, a common purchaser or common carrier of natural gas may alter or amend its price paid, rates, charges, and conditions of service by application to and approval by the commission in the same manner and by the same process and under the same legal limitations and like right as are now provided by statute for the regulation by the commission of the rates for electricity transmitted in this state and process of appeal as provided in section 26 of Act No. 300 of the Public Acts of 1909, being section 462.26 of the Michigan Compiled Laws.

Apparently, it has not been the PSC's practice to

approve or disapprove the prices, conditions of
service, or other terms set forth in initially filed
gas-transportation contracts unless and until Con-
sumers seeks to change the price or other terms
set forth in the contracts. However, in establishing
the gas-transportation tariffs in the instant case,
the PSC ordered that on-system transportation be
performed in accordance with the new tariffs,
instead of according to the terms of contracts filed
pursuant to Act 9, although the continued use of
Act 9 contracts was left as an option for off-system
transportation service. The PSC explained the
change in approach as follows:

> While the Commission will allow Consumers to
> continue its existing use of Act 9 contracts for off-
> system transportation for either producers or end-
> users, we do not agree that Consumers has any
> right to utilize Act 9 contracts for on-system trans-
> portation following implementation of the trans-
> portation program and tariffs adopted by this or-
> der.
>
> Act 9 does not explicitly provide for transporta-
> tion in the form currently utilized by Consumers.
> Indeed, a strong argument can be made that Sec-
> tion 10 of Act 9 requires not only the filing of
> transportation contracts, but also the filing of and
> adherence to a schedule of rates and charges in
> the form of tariffs.
>
> In its infancy, transportation service represented
> a marked departure from traditional utility ser-
> vice. The Commission's initial regulatory response
> of allowing transportation services to be con-
> tracted for on a case-by-case basis was appropriate.
> The use of contracts allowed transportation to
> mature and to be studied as it developed so that
> an appropriate regulatory response could be for-
> mulated. To do otherwise might have unduly hin-
> dered the development of transportation to the
> detriment of both Consumers and its transporta-
> tion customers. However, now that transportation

has emerged from its initial evolutionary period,
the Commission finds it is no longer appropriate
for Consumers to perform on-system transporta-
tion by the filing of contracts. Rather, following
the implementation of the transportation program
provided for in this order, all on-system transpor-
tation shall be performed pursuant to Consumers'
T-1 and T-2 tariffs.

The PSC further noted its general authority to
regulate gas rates and services under § 6 of 1939
PA 3, MCL 460.6; MSA 22.13(6), as well as its
specific authority to fix rates and charges for the
transmission of gas under § 4 of the Public Utili-
ties Commission Act, MCL 460.54; MSA 22.4.

Consumers interprets § 10 of Act 9 as granting
utilities an absolute right to set the initial price of
transportation services by contract without PSC
approval, and argues that by requiring adherence
to the newly established tariffs the PSC effected an
unauthorized repeal of the statute. We find Con-
sumers' interpretation of § 10 of Act 9 questiona-
ble. This Court has previously observed that the
statute is simply silent with regard to PSC approval
of the initial contract price and that this silence
should not be interpreted as granting utilities
unfettered discretion in setting initial prices and
conditions of service without any regulatory over-
sight, inasmuch as the statute expressly empowers
the PSC to adopt rules and conditions of service
governing the filing of such contracts:

> The statute is silent as to PSC approval of the
> initial price. It provides, however, that these con-
> tracts "be stated and set up in the manner and
> form required by the commission and outlined in
> its rules and regulations for filing of rates of
> artificial gas utilities or in accordance with such
> rules, regulations and conditions of service as may
> be hereafter adopted by the commission and which

it is hereby empowered to make for the regulation of such common purchasers.

Clearly, the statute does not contemplate that producers and Mich Con may enter into initial contracts for the purchase of gas which contain pricing provisions or rate schedules determined at the parties' whim and caprice. The statute mandates that these initial contracts adhere to the rules and regulations of the PSC. [*Antrim Resources v Public Service Comm,* 179 Mich App 603, 611; 446 NW2d 515 (1989), interpreting nearly identical provisions of the statute before amendment in 1987.]

Here, the PSC's requirement that the terms of Consumers' on-system contracts conform with the newly established gas-transportation tariffs may be viewed as a rule or standard adopted by the PSC in accordance with the express language of the statute. The PSC may establish such standards in the context of a contested-case proceeding in lieu of the rule-making procedures of the Administrative Procedures Act. *Id.* at 615; *Northern Michigan Exploration Co v Public Service Comm,* 153 Mich App 635, 649; 396 NW2d 487 (1986). See MCL 24.207(f); MSA 3.560(107)(f).

We find the PSC's interpretation of § 10 of Act 9 to be consistent with the PSC's broad rate-making authority under § 4 of the Public Utilities Commission Act and § 6 of 1939 PA 3. Consumers' construction of the statute would restrict the PSC's exercise of its rate-making authority to an individual contract-by-contract approach, frustrating the PSC's ability to establish and maintain uniform and nondiscriminatory rates throughout the gas-transportation industry. Reading the various statutes together, we find the approach adopted by the PSC to be consistent with the legislative purpose.

IV

Consumers next challenges the PSC's disallowance of $100,000 out of approximately $1.4 million paid by Consumers for bill collection services performed by SCS, an unregulated sister subsidiary, in the PSC's calculation of Consumers' operating expenses. The disallowance was recommended by the PSC's staff. Staff witness Susan Devon testified that this figure represented forty-seven percent of the "excess earnings" generated by SCS through its business with Consumers. She noted that Consumers provides eighty-two percent of SCS' business, and that, according to an exhibit submitted by Consumers, SCS' return on common equity was slightly in excess of fifty percent, far greater than Consumers' own authorized return. She further testified that Consumers denied the staff access to SCS books and records that would indicate whether the forty percent collection fee SCS charges Consumers is competitive compared to the rates SCS charges to other utilities it serves. However, the staff was able to independently verify that at least one other utility using SCS services pays only a thirty-five percent collection fee. One utility, Michigan Consolidated Gas Company, pays a thirty-five percent fee to all of the national independent collection agencies it uses. On cross-examination, Devon conceded that the staff's independent study revealed that one other utility, Southeastern Michigan Gas Company, was also charged a forty percent fee by SCS. Devon explained that this accounted for only two percent of the uncollectable debts Southeastern turns over to various collection agencies, whereas Consumers turns over virtually one hundred percent of its uncollectables to SCS. Devon also acknowledged that some of the other outside collection agencies listed in the staff's

study charged as much as fifty percent for some collections, but explained that these were smaller, independent collection agencies that she did not think were comparable to SCS.

Consumers called its general customer information and credit manager, Judith Voisine, as a rebuttal witness, and presented exhibits showing that the fees SCS charges vary according to certain variables, including the age of the account and whether the utility desires that a "precollection letter" be utilized. Voisine explained that Consumers pays SCS the forty percent fee, instead of the thirty-five percent fee paid by Michigan Gas Company, because it has selected the precollection-letter option whereby a series of three collection letters are sent out approximately thirty days after the due date of a bill. The accounts that remain unpaid after ninety days are designated uncollectable. She explained that because SCS receives only a 22.5 percent commission on uncollectable dollars transferred to active Consumers' accounts, the effective rate of its commissions was actually thirty percent for 1987. She acknowledged, however, that the precollection-letter option is not a service normally provided for utilities by outside collection agencies, which typically offer only uncollectable-account collection service. She explained that SCS was formed to improve the effectiveness of Consumers' collection efforts, hold collection costs down (particularly with respect to small accounts under $100), and to gain a measure of control over the methods used to recover Consumers' uncollectables. As proof of SCS' success, she offered two exhibits showing that the ratio of Consumers' bad-debt loss to revenue had steadily improved over the years, giving Consumers the best ratio of the four major Michigan utilities in 1987, as well as the best ratio in comparison to the

ten largest combination utilities nationwide. She acknowledged, however, that the poor relative performance of other Michigan utilities could be attributable to factors other than the collection service used, such as depressed economic conditions in the service area involved.

The PSC adopted the recommended disallowance, finding that Consumers had failed to meet its burden of establishing both a good business reason for transferring its debt collection activities to an unregulated subsidiary and that the costs associated with its decision to do so are reasonable. On appeal, Consumers has the burden of proving by clear and satisfactory evidence that the PSC's decision is unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8). A decision of the PSC is unlawful when it involves an erroneous interpretation or application of law, and unreasonable when it is unsupported by the evidence. *Attorney General v Public Service Comm,* 165 Mich App 230, 235; 418 NW2d 660 (1987). Any factual determinations must be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28.

We are unpersuaded by Consumers' argument that the PSC's decision was based upon an erroneous legal standard merely because the PSC required Consumers to establish a good business reason for transferring its debt collection activities to an affiliate in addition to establishing the reasonableness of the debt collection fees it paid to SCS. It is well recognized that expenses incurred in transactions between utilities and their affiliates deserve special scrutiny, given the potential lack of arms-length bargaining and improper subsidization of the affiliate's unregulated operations through the utility's rates. See generally 64 Am Jur 2d, Public Utilities, § 187, pp 702-703. The PSC need not as-

sume that the fees charged to a utility by its affiliate are fair, and the utility has the burden of proving the reasonableness of its transaction with its affiliates. *Michigan Bell Telephone Co v Public Service Comm,* 85 Mich App 163, 168-169; 270 NW2d 546 (1978); *General Telephone Co v Public Service Comm,* 78 Mich App 528, 534; 260 NW2d 874 (1977). When setting rates, the PSC is not bound by any particular formula or method in determining what is just and reasonable, but has broad discretion to determine the factors relevant to its analysis and to make adjustments as necessitated by the particular circumstances of a given case. *Attorney General v Public Service Comm,* 189 Mich App 138, 147-148; 472 NW2d 53 (1991).

We find that the PSC's requirement of a "good business reason" for Consumers' transfer of its debt collection activities to SCS is a lawful exercise of the PSC's discretion. Consumers' reason for the transfer was not made the sole criterion by which the SCS expenses were judged, but simply one of the factors in determining the overall reasonableness of the charges. Given the fact that SCS performs at least some activities that are not usually performed by outside collection agencies but by utilities themselves, such as sending precollection letters for accounts that the utility has not yet designated uncollectable, it seems reasonable to require Consumers to come forward with some legitimate reason for transferring such activities to an affiliate. Furthermore, although the transfer was a managerial decision made by Consumers, which the PSC may not control directly, the PSC clearly possesses the authority to deny Consumers recovery through its rates of any increased expenses incurred as the result of Consumers' unsound or noneconomic business choices. See *Union Carbide Corp, supra* at 149-150.

We also find no merit in Consumers' contention that the PSC's decision is not supported by competent, material, and substantial evidence on the whole record. Substantial evidence exists for a decision of the PSC if it is supported by opinion testimony offered by a single qualified expert witness with a rational basis for the expert's views, whether or not other experts disagree. *Great Lakes Steel Div of National Steel Corp v Public Service Comm,* 130 Mich App 470, 481; 344 NW2d 321 (1983). Here, the testimony of staff witness Devon supports the PSC's conclusion that Consumers had failed to prove the reasonableness of its SCS expenses. Although she was not able to rule out the possibility that other utilities were able to obtain collection services at lower rates because of differences in the age of the accounts involved or the quality of the collection services provided, Devon was able to show that Consumers was paying five percent more than at least one other utility, casting some doubt on the reasonableness of Consumers' expenses. Moreover, the testimony of Consumers' own rebuttal witness indicates Consumers paid SCS for collection of relatively young accounts, turning the accounts over for collection after only ninety days, whereas other utilities may attempt to collect such past-due active accounts on their own before turning the accounts over to an outside collection agency. Moreover, there was evidence that SCS earns a rate of return on equity in excess of fifty percent, more than three times Consumers' own authorized rate of return. While not alone determinative, the rate of return earned by an affiliate is evidence that may be considered by the PSC in determining the reasonableness of a utility's transactions with its affiliates. *General Telephone Co, supra* at 536.

v

Consumers next argues that the PSC unreasonably and unlawfully refused to offset $9.8 million of gain resulting from the sale of certain pension assets in 1987 by commensurate expenses booked in 1987 and associated with a special compensation program. During 1987, but after the test year ending on June 30, 1987, Consumers settled a portion of its pension obligation through the sale of certain pension fund assets and the purchase of a single premium annuity to be used to provide benefits for retirees. The net gain realized as a result of the settlement of this obligation was $39 million. Approximately $29 million of the gain was offset against Consumers' expenses associated with its 1987 early retirement program, such as increased benefit obligations, severance payments, relocation expenses, and vacation accrual. However, the PSC refused to offset the remaining gain against Consumers' expense for the special-compensation program, adopting instead the recommendation of the PSC staff that the gas portion (30.8 percent) of the remaining gain be amortized over a five-year period, resulting in a reduction of $651,000 in the cost of service for the test year.

Consumers argues that by recognizing the nonrecurring pension asset gain, but not Consumers' "contemporaneous" nonrecurring special-compensation program expense, the PSC acted arbitrarily and in violation of Consumers' due process rights. Consumers relies upon *Michigan Consolidated Gas Co v Public Service Comm,* 389 Mich 624; 209 NW2d 210 (1973), and *General Telephone Co, supra.* In *Michigan Consolidated Gas Co,* the Supreme Court affirmed a preliminary injunction permitting the utility to increase its rates above the level ordered by the PSC, finding that the PSC

acted arbitrarily and unreasonably by taking into account certain future expense reductions while refusing to consider increases in other costs in the future. Similarly, in *General Telephone Company,* this Court upheld the disallowance of an adjustment to the utility's operating income to reflect anticipated increases in directory revenue extending beyond the test year, where the PSC had refused to consider anticipated wage increases for that same period on grounds that the increases were too speculative.

We find these cases distinguishable. Unlike the comparable items of future expense and revenue involved in *Michigan Consolidated Gas Co* and *General Telephone Co,* there are significant, qualitative differences between Consumers' gain on the sale of pension assets and its special-compensation expense. Consumers' gain was fully realized in 1987 as a result of transactions occurring that year, albeit outside the test year. In contrast, Consumers' special-compensation expense was a "mark-to-market" adjustment for a special-compensation plan that ran from October 1984 through December 1986. There is no indication that the utility incurred any actual cash expense associated with the adjustment to its books in 1987.

It is also significant that the revenues and expenses in question are nonrecurring. In general, nonrecurring expenses are not recognized for rate-making purposes, even if the expense is otherwise reasonable and proper. Consumers' own witness, Royal Lefere, testified that Consumers' special-compensation expense was a nonrecurring expense of the type that generally should not be used for rate-making purposes. Consumers' gain from the sale of pension assets might also be viewed as a nonrecurring event that normally should be ex-

cluded for rate-making purposes. However, the PSC found that because Consumers' ratepayers had funded Consumers' pension programs through past rates, they are entitled to benefit from the transaction just as they would pursuant to Statement of Financial Accounting Standard No. 87 had Consumers not settled its pension obligations through the purchase of an annuity. In other words, the PSC reasoned that because ratepayers would have received the benefit of the increased market value of the pension assets over the years had they not been sold, it is proper to carry forward the gain in future years by amortization. It is true that ratepayers generally do not acquire any interest in property a utility purchases with its revenues. *Bd of Public Utilities Comm'rs v New York Telephone Co,* 271 US 23, 32; 46 S Ct 363; 70 L Ed 808 (1926). However, ratepayers may indeed acquire a protectable interest in the utility's capital gains received on the disposition of utility assets where the ratepayers have been charged with the costs or burden of investment in those assets as a rate expense. See *Washington Gas Light Co v Public Service Comm,* 450 A2d 1187, 1239 (DC App, 1982); *Democratic Central Committee v Washington Metro Area Transit Comm,* 158 US App DC 7; 485 F2d 786 (1973), cert den 415 US 935 (1974). See also *CMS Energy Corp v Attorney General, supra.*

The PSC's action is consistent when viewed from this theoretical perspective. To the extent that there were nonrecurring expenses associated with the ratepayers' interest in Consumers' pension program, i.e., the $29 million expended in 1987 for the early retirement program, an offset was allowed. This nonrecurring expense might also have been amortized over the five-year period, but the netting of associated gain would result in an amortization amount of zero. Consumers' booked spe-

cial-compensation-plan expense, however, lacked
any nexus to its ratepayers' long-term interest in
the utility's pension and retirement programs to
justify including the expense in the cost of service
for a future test year. Accordingly, we find that
Consumers has failed to meet its burden of estab-
lishing by clear and satisfactory evidence that the
PSC's action was unlawful or unreasonable.

VI

Finally, Consumers argues that the PSC acted
arbitrarily and capriciously in imputing "phan-
tom" revenues to Consumers in the amount of the
fifty percent distribution charge discount estab-
lished for Consumers' Rate D economic-develop-
ment rate. In 1985, the PSC approved Consumers'
application for the Rate D economic-development
rate. The discount rate was to be available to all
new industrial customers with a load of at least
100,000 mcf annually and all existing customers
who would install additional gas-fired equipment
designed to add at least 100,000 mcf annually to
the customer's normal base-period gas require-
ments. Rate D is comprised of a monthly service
charge, gas-cost recovery factor, and a distribution
charge discounted fifty percent from the distribu-
tion charge that would otherwise apply to the
service provided, i.e., the distribution charge pro-
vided for in the applicable general service rate
schedule. The purpose of this discounted rate is to
attract additional industrial activity in Consumers'
service area, thereby improving the economic de-
velopment of the state. Additionally, all of the
parties agree that this discounted rate is not in-
tended to result in any increase in the cost of
service to Consumers' other customers. In theory,
the incremental cost of providing the discount-rate

service to Rate D customers is expected to be less than or equal to the reduced rate Rate D customers are charged.

The PSC's December 17, 1985, order approving Rate D indicates that because the new rate was not expected to result in any increase in costs to other customers, the PSC approved the rate without conducting a contested-case hearing; yet the order specifically prohibits Consumers from recovering any Rate D revenue loss from other rate categories:

> In reviewing the proposed rate, the Commission finds that the new rate will not alter any existing approved rate, nor will it result in an increase in the cost of service to any customer. Therefore, pursuant to [MCL 460.6a(1); MSA 22.13(6a)(1)] a hearing is not required.
>
> Although the Commission is convinced that in approving the proposed rate no other customer class will be adversely affected, the Commission will prohibit Consumers from recovering any revenue loss that may result due to implementing the proposed rate from any other rate category. As a further safeguard, the Commission will require Consumers to make periodic reports detailing the revenues derived as a result of the implementation of the rate. The Commission can then expeditiously make necessary modifications to the rate if any adverse impact upon present or proposed rates is identified outside the context of a general rate case proceeding.

In the instant proceedings, the PSC staff recommended doubling Consumers' expected distribution charge revenues at the fifty percent discounted rate, $193,698, in effect imputing the distribution charges Consumers would have received for the service but for the discount. The PSC adopted its staff's proposal, concluding that the imputation of

revenues is necessary to protect Consumers' other classes of customers from subsidizing the Rate D rate:

> In both its original application and its application for extension of Rate D, Consumers alleged that Rate D would not alter any existing rate or rate schedule and would not result in any increases in the cost of service to any of its existing customers. Further, in originally approving the rate the Commission specifically noted that it "will prohibit Consumers from recovering any revenue loss that may result due to implementing the proposed rate from any other rate category." (Order dated December 17, 1985, p 3.) The Commission finds that the Staff's inclusion of imputed revenues is necessary and appropriate to protect Consumers' other ratepayers as provided for in our December 17, 1985 order.

We again find that Consumers has failed to meet its burden of establishing that the PSC's action is unlawful or unreasonable. The PSC's theory in support of imputing the revenue seems logical, reasonable, and consistent with its 1985 order. It was understood from the outset that Consumers would charge only half of what it would normally receive in distribution charges for the Rate D rate, but would not collect from its other customers any excess of expenses after revenues. Imputing additional revenue in the amount of the fifty percent distribution charge reduction in effect results in a pro tanto reduction of Consumers' distribution expenses recoverable through general rates, thereby ensuring that no cross-customer subsidization occurs. Contrary to Consumers' argument, it is not left with a distribution charge of zero, but will receive the full $193,698 in distribution charge revenue provided for under the Rate D

discount to recover its various nongas costs of providing the service.

Consumers complains that there is absolutely no evidence in the record showing that Rate D resulted or will result in any increase in the cost of service to its other classes of customers. However, it is also true that Consumers has failed to cite any record evidence indicating that the cost of service to its other classes of customers does not increase as a result of the discounted Rate D service. We find that the onus was on Consumers to come forward with evidence establishing that the cost of service to its other customers was unaffected by the fifty percent shortfall in normal distribution charge revenue obtained for the Rate D service, particularly because the discount rate was approved by the PSC ex parte and solely on the basis of Consumers' assurances that its other classes of customers would not be adversely affected. Consumers' reliance upon *Pennwalt Corp v Public Service Comm,* 166 Mich App 1; 420 NW2d 156 (1988), is misplaced in this regard. There, it was only because the propriety of the challenged utility costs had been fully litigated in a previous rate proceeding that the burden was placed upon the challenger to come forward with new evidence or evidence of a change in circumstances.

Except as modified in section I of this opinion, the PSC's orders are affirmed.

WAHLS, J., concurred.

TAYLOR, J. *(concurring in part and dissenting in part).* I disagree with the majority's analysis and disposition of most of the issues presented. Prefacing my analysis of the points with which I take exception (majority issues I, III-VI) is a short description of the backdrop against which the issues must be seen.

I

The Public Service Commission was created partly to protect the smaller customers of public utilities enjoying service monopolies.[1] Utilities are businesses with shareholders who generally expect to realize returns on their investments. As a result, utilities are caught between the authority of the PSC on the one hand and the expectations of shareholders on the other.

In 1987, Consumers Power began reorganizing its corporate structure,[2] and to that end created a holding company (CMS Energy Corporation) and various subsidiaries (including Selective Collection Services) and joint business ventures (Midland Cogeneration Venture Limited Partnership among them). It began transferring some of its nonregulated subsidiaries, i.e., those whose function did not fall directly within the jurisdiction of the PSC, over to yet other subsidiaries. After Consumers' reorganization, the PSC began to experience difficulty tracking the contractual arrangements between these related entities, and, as a result, the PSC's ability to set fair rates in the manner it had previously also declined. That is, just examining Consumers' books, ledgers, and contracts did not tell the whole story any more.

For example, in this case the PSC heard testimony to the effect that Consumers and its affiliate(s) were not engaging in normal arms-length transactions, and there was concern that Consumers was acceding to rates for goods or services provided by its own affiliates that were higher than the rates it would have been charged in the

[1] See *Panhandle Eastern Pipe Line Co v Michigan Public Service Comm*, 328 Mich 650, 664; 44 NW2d 324 (1950), aff'd 341 US 329; 71 S Ct 777; 95 L Ed 993 (1951).

[2] See *CMS Energy Corp v Attorney General*, 190 Mich App 220, 225; 475 NW2d 451 (1991).

open market. The extra profit would then show up on the affiliate's books, and CMS shareholders would reap an inflated return. Consumers could then, it was advanced, claim that the inflated prices it had paid a related entity justified an increase in the rates paid by ratepayers for their utility services. In this way, smaller ratepayers would subsidize the nonutility (thus nonregulated) businesses to which Consumers was related.

The laws giving the PSC the power to regulate utilities did not, and perhaps cannot, change so as to follow Consumers' metamorphosis through its complicated business restructuring. As a consequence, the PSC may be thwarted in its mission of protecting the smaller utility customers.

The majority understandably wants the PSC to successfully continue its regulatory mission. For that reason, and with good intentions, the majority arrives at the conclusion that the PSC has the statutory authority to force Consumers to provide information concerning unregulated affiliates and related companies. I cannot agree with the majority's position for the reasons discussed *infra*. I believe the PSC lacks the statutory authority, and therefore lacks the power, to use its authority over Consumers to force an entity over which the PSC has no authority to turn over information concerning its own business to the PSC.

However, I would note that the PSC already has in its arsenal the power to accomplish its mission, albeit with different tactics, in the following way.

The PSC's regulatory function includes the power to set rates. MCL 460.6(1), 460.6a(1), (2); MSA 22.13(6)(1), 22.13(6a)(1), (2); *Union Carbide Corp v Public Service Comm*, 431 Mich 135, 147-148; 428 NW2d 322 (1988). That power is the tool with which the PSC can prevent cross-subsidization of nonutilities by ratepayers. The burden of proof is

on the utility to justify the inclusion of affiliate-based costs in its rate base. The PSC need only draw an adverse inference whenever information it reasonably believes is relevant and within the control of an affiliate or other related entity has not been furnished. See the footnote in *Tortora v General Motors Corp,* 373 Mich 563, 569; 130 NW2d 21 (1964). Any corporation interested in making a profit will be only too glad to provide better, more detailed information to the PSC, including information obtained from an affiliate, in an effort to justify the highest supportable rate of return for its investors. If an affiliate, joint venture, or subsidiary such as MCV is not cooperative, the PSC may draw an adverse inference or, equivalently, find that the parent utility has thereby failed to carry its burden of proof that a higher rate of return should be allowed.

The same reasoning applies to the question whether the PSC has the power to regulate by tariff the price of an initial contract for the transportation of on-system gas. For the reasons I give below, the PSC does not have the power to set that price directly. Again, however, nothing prevents the PSC from accomplishing through different tactics its mission of protecting Consumers' customers from paying unfairly high rates. The PSC has the authority to impute to Consumers the profit it would have reaped had the affiliates' services been rendered at an appropriate rate, i.e., the rate(s) indicated in the tariffs or whatever price the PSC considers reasonable. *Union Carbide, supra* at 149. Here, the PSC has the authority to decide whether Consumers' dealings with MCV involved unreasonable, imprudent, or otherwise improper terms, and whether the cost to Consumers for the consideration it received should be included in Consumers' rate base or disallowed. *Consumers Power Co v*

*Michigan Public Service Comm No 1*, 196 Mich App 436, 454; 493 NW2d 902 (1992). In this way, the utility shareholders, rather than the ratepayers, will bear the brunt of any shortfall in revenue caused by the utility selling its wares at giveaway prices or buying goods or services at inflated prices. Conversely, the shareholders may reap the benefits of any unregulated sales contract set at a price above the price reflected in the tariff. This is as it should be.

I now turn to the specifics of the areas of disagreement I have outlined above.

II

I disagree with the majority that the PSC has authority to impose the seven conditions in question (see majority's issue I).

The PSC does not exist by its own right. It was created by statute, and it lacks power to do anything unless it is given a specific power by the Legislature in a statute. If there is no statute telling the PSC that it can do something, then the PSC cannot do that thing. *Union Carbide, supra* at 146, 151; *Consumers Power Co v Public Service Comm*, 189 Mich App 151, 176; 472 NW2d 77 (1991). For example, although the PSC may set a utility's rates, it cannot make management decisions for the utility. *Union Carbide, supra* at 148; *CMS Energy Corp v Attorney General*, 190 Mich App 220, 228; 475 NW2d 451 (1991).

The PSC also cannot regulate nonutility companies. However, under some circumstances the line between a utility and one of its nonregulated, related entities may be disregarded, i.e., the corporate veil of the nonregulated company may be pierced and it may be regulated when the companies are extremely closely intertwined. See *CMS*

*Energy, supra* at 232. I agree with the majority opinion in this case that the relationship between Consumers and MCV does not allow MCV's corporate veil to be pierced. *Michigan Bell Communications, Inc v Public Service Comm,* 155 Mich App 40, 46-47; 399 NW2d 49 (1986). So unless there is a statute that specifically allows the PSC to require the related entities to report and give information to the PSC, the PSC does not have the power to establish the conditions it has set forth in its order.

Requiring the related entities to supply such information to the PSC is but the first step of a process of regulating entities that the PSC lacks the power to regulate, and constitutes an improper assertion of PSC jurisdiction. *Panhandle Eastern Pipe Line Co v Public Service Comm of Indiana,* 332 US 507, 511-512; 68 S Ct 190; 92 L Ed 128 (1947).

III

I disagree with the majority's analysis of the PSC's requirement that Consumers must set its initial on-system gas transportation contract prices at amounts reflected in the new tariff schedule (see majority's issue III). Section 10 of 1929 PA 9, MCL 483.110; MSA 22.1320, allows a utility to negotiate the initial price to be paid for gas transportation service with its customers. The PSC does not have the power to regulate that initial price. Section 10 does provide that after the initial contract has been filed as required, the terms of a gas-transportation-service contract may not be altered or amended without the approval of the PSC. Despite this express language, the PSC ordered that any initial contract price must be set at the rate(s) set forth in the PSC's newly adopted tariffs.

These tariffs are not rules or standards, they are rates. To let the PSC force Consumers to enter into initial contracts at a specific rate abrogates § 10.

The majority says that § 6 of the Public Service Commission Act, 1939 PA 3, MCL 460.6; MSA 22.13(6), and § 4 of the Public Utilities Commission Act, 1919 PA 419, MCL 460.54; MSA 22.4, give the PSC the power to regulate the initial contract price. The meat of this argument has already been rejected by our Supreme Court. See *Union Carbide, supra* at 147, 151, and *Huron Portland Cement Co v Public Service Comm,* 351 Mich 255; 88 NW2d 492 (1958), where the Supreme Court has said these two sections only set out the PSC's power in general terms; they do not grant specific powers. Section 10 is specific where the other two sections are not, and under the ordinary rules of statutory construction, the specific supersedes the general whenever there is a conflict.[3]

The majority also argues that, because § 10 does not actually say that the PSC cannot regulate the initial contract price, it may do so. This argument assumes that unless the Legislature passes a law to prevent the PSC from acting, then it can act. But the converse of this argument is actually the rule: unless the Legislature allows the PSC to act by passing a statute empowering it to do so, the PSC cannot act. The Legislature has not empowered the PSC to control initial contract prices; therefore, it has no such power. If the general jurisdictional statutes upon which the majority relies implicitly gave the PSC such authority, then there would have been no need for the passage of § 10 of 1929 PA 9 or the many other statutes. *Union Carbide, supra* at 147 (quoting with approval *Huron Portland Cement, supra* at 263).

---

[3] *Imlay Twp Primary School Dist No 5 v State Bd of Ed,* 359 Mich 478, 485; 102 NW2d 720 (1960); *City of Marysville v Pate, Hirn & Bogue, Inc,* 154 Mich App 655, 661; 397 NW2d 859 (1986).

The majority and the PSC appear to believe that if Consumers is allowed to proceed as it historically has, it will enter into initial gas-transportation contracts at unreasonable prices to the detriment of ratepayers. However, when it enacted § 10 of 1929 PA 9, the Legislature obviously believed that allowing the buyer and the seller to set the initial price would result in reasonable pricing. The transportation customers in question are typically large industrial users who have access to alternate sources of fuel; thus, the prospect of unreasonable leverage by one side or the other is unlikely. But even if there were reason for these economic concerns, it is for the Legislature, not this Court or the PSC, to amend § 10.

To the extent that this Court held otherwise in *Antrim Resources v Public Service Comm,* 179 Mich App 603; 446 NW2d 515 (1989), I believe it erred. However, I am forced to concur with the majority's decision to affirm the decision of the PSC in this regard, but only because this Court made the *Antrim* reasoning binding precedent under Administrative Order No. 1990-6, 436 Mich lxxxiv, extended by Administrative Order No. 1991-11, 439 Mich cxliv, and Administrative Order No. 1992-8, 441 Mich lii, in *Antrim Resources v Public Service Comm,* 186 Mich App 668, 669; 465 NW2d 394 (1991).

IV

I disagree with the majority regarding the test used by the PSC to disallow $100,000 out of approximately $1.4 million paid by Consumers to Selective Collection Services, Consumers' unregulated sister subsidiary, for bill collection services (see majority's issue IV). The majority concludes that Consumers was required to demonstrate that there

was a good business reason for turning its collection work over to scs in the first place, in addition to showing that the amount paid to scs by Consumers was reasonable. But case law requires only that the psc allow a utility to recover all reasonable costs of doing business, *General Telephone Co v Public Service Comm,* 341 Mich 620, 631; 67 NW2d 882 (1954), and this test applies also to the costs of doing business with affiliates, *General Telephone Co v Public Service Comm,* 78 Mich App 528, 534; 260 NW2d 874 (1977). The reasonable-cost test does not include an inquiry into whether Consumers had a good business reason to transfer the activity to another entity. As long as the cost associated with contracting out its debt-collection work is a reasonable cost of doing business, the fact that Consumers could itself collect on debts is not fatal or even relevant to the psc's inquiry.

As it now stands, the majority has approved the psc's new test, or the addition of a second prong to the original test, which the psc contrived in the first place in an effort to stop Consumers from forming subsidiaries. The majority thus diverges from the law. If Consumers' formation of subsidiaries is an evil to be avoided, then it is for the Legislature, not this Court or the psc, to prohibit such formation or to authorize such regulation.

Our Supreme Court has specifically held that the power to control and regulate public utilities does not include the power to order a utility to follow particular principles of economic management. *Union Carbide, supra* at 151. The psc does not have the power to make management decisions concerning the economic operations of a public utility, or to order the cessation of noneconomic management practices. *Id.* at 152, 154-155; *Attor-*

*ney General v Public Service Comm,* 412 Mich 385;
316 NW2d 187 (1982). The panel in *Attorney General* held that the scope of the PSC's inquiry in a
securities-issue proceeding "[did] not extend to the
wisdom of the project which a utility [sought] to
fund through the issuance of long-term securities."
*Id.* at 391-392, quoted with approval in *Union
Carbide, supra* at 154. In this context, asking
whether there was a good business reason for
Consumers' decision to contract out its collection
work is tantamount to asking whether it was a
wise decision, a test rejected by our Supreme
Court.

I would also find that the PSC used the wrong
standard to disallow the specific sum of $100,000.
Rate making is a legislative function, one entrusted to the expertise of the PSC by the Legislature. Legislative policy decisions by the PSC, if
made properly, are not reviewable by the courts.
*Michigan Consolidated Gas Co v Public Service
Comm,* 389 Mich 624, 644-645; 209 NW2d 210
(1973) (WILLIAMS, J., dissenting). When the PSC
establishes a rate, it is making a rule for the
future and so is acting legislatively, not judicially.
*Pennwalt Corp v Public Service Comm,* 166 Mich
App 1, 8-9; 420 NW2d 156 (1988). But when reviewing past actions taken and decisions made by
a utility, the PSC itself must apply judicial-type
standards, i.e., a "reasonable utility management"
test, instead of engaging in endless Monday morning quarterbacking. *Residential Ratepayer Consortium v Public Service Comm,* 198 Mich App 144;
497 NW2d 558 (1993). I would remand this case to
the PSC and direct that the PSC apply the reasonable utility management standard, which is a
judicial rather than a legislative standard, to retrospectively consider the arrangement between
Consumers and SCS and to determine whether any

portion of the amount paid to scs by Consumers should be disallowed.

V

I would find that the psc improperly refused to offset Consumers' $9.8 million gain resulting from the sale of pension assets in 1987 by corresponding special compensation expenses booked that same year (majority's issue v). If such a gain is to be considered in reducing rates, then contemporaneous reasonably incurred expenses must also be recognized. *Michigan Consolidated Gas Co, supra* at 640; *Ass'n of Businesses Advocating Tariff Equity v Public Service Comm,* 430 Mich 33, 39; 420 NW2d 81 (1988). Fairness dictates that Consumers be allowed to recover its reasonable expenses. *General Telephone Co, supra,* 341 Mich 631. The fact that ratepayers funded Consumers' pension programs through the payment of rates does not mean that the ratepayers must reap the benefit of the realized gain. I would find that, once the money was paid to the utility, the money lost its character as "ratepayers' money" in this case. *Bd of Public Utilities Comm'rs v New York Telephone Co,* 271 US 23; 46 S Ct 363; 70 L Ed 808 (1926).[4]

VI

I would find that the psc improperly imputed "phantom" revenues to Consumers in the amount of an economic-development customer discount called "Rate D" (majority's issue vi). This discount was to be made available to certain new industrial customers, as the psc's 1985 order says:

---

[4] This is not a case where ratepayers were charged with the costs or burden of investment in the pensions as a rate expense. Cf. *CMS Energy Corp v Attorney General,* 190 Mich App 220, 229, 234; 475 NW2d 451 (1991).

The Commission is convinced that the attraction of new large industry to Michigan can generally benefit the citizens of this state and, specifically, Consumers' customers. Michigan's citizens benefit by increased jobs and tax receipts for state and local governments; Consumers' ratepayers benefit by increased gas sales by Consumers and thereby increased revenues, which should result in a corresponding decrease in the cost of service to all customers.

In reviewing the proposed rate, the *Commission finds that the new rate will not alter any existing approved rate, nor will it result in an increase in the cost of service to any customer.* [Emphasis supplied.]

However, after the PSC reached the conclusion that the discount rate would not alter any existing approved rate or cause an increase in the cost of service to other customers, and without evidence of a change in circumstances, it imputed a sum equal to the total amount of the Rate D discount— money that Consumers, of course, never actually received. The PSC simply assumed that Consumers was subsidizing the Rate D payers by charging other ratepayers more. Consumers was treated as if it had actually received the discounted sum even though no evidence was presented showing that the PSC's original finding was unreasonable because the situation had changed. I would therefore apply *Pennwalt Corp, supra* at 9, most recently cited with approval in *Consumers Power Co v Public Service Comm No 1, supra,* 196 Mich App 447. As in *Pennwalt,* the burden was on the challenger to come forward with evidence of a change in circumstances, and that burden was not carried in this case.

In all other respects I agree with the majority opinion.